878 P.2d 319

Sherri **BARTH**, Plaintiff–Appellee,

v.

James **COLEMAN and Antiquities and Art Objects, Inc., d/b/a Senor Buckets,** Defendants–Appellants.

No. 20311.

Supreme Court of New Mexico.

June 14, 1994.

Rhodes & Salmon, P.C., Mark M. Rhodes, Hazen H. Hammel, Albuquerque, for appellants.

William S. Ferguson, Albuquerque, for appellee.

### OPINION

BACA, Justice.

This lawsuit arises out of a barroom fistfight between two patrons of the Señor Buckets nightclub (Buckets). Plaintiff-appellee, Sherri Barth (Barth) was injured at Buckets when another patron, Sheryl Martinez (Martinez), hit Barth in the nose. Alleging negligence, Barth sued defendants-appellants, Buckets and James Coleman (Coleman), who was the manager of Buckets, for the injuries and damages she suffered at the hands of Martinez. Following a bench trial, the district court granted Barth judgment against Coleman and Buckets, jointly and severally, in the amount of $5000, plus costs. In addition, the district court granted declaratory judgment in favor of the Evanston Insurance Company (Evanston), an intervening party in Barth's lawsuit against Coleman and Buckets. The court declared that the insurance policy that Evanston issued to Buckets did not provide coverage for Barth's damages. Coleman and Buckets appeal both judgments of the district court. On appeal, we address the following two issues: (1) Whether the district court erred when it refused to allocate a percentage of fault to Martinez and Barth, and (2) whether the district court erred by issuing a declaratory judgment holding that the insurance policy issued by Evanston to Buckets did not cover

the damages sustained by Barth. We review this case pursuant to SCRA 1986, 12–102(A)(1) (Repl.Pamp.1992). We reverse both judgments of the district court and remand for proceedings consistent with this opinion.

## I.

The altercation forming the basis of this lawsuit took place on February 3, 1989, while Barth was at Buckets. Barth and another group of patrons at the nightclub engaged in a verbal confrontation. Barth reported the incident to Coleman when the confrontation intensified. Coleman assured a worried Barth that she should not be alarmed and that he would monitor the situation. Coleman, however, took no action to control the situation or to prevent escalation of the confrontation between the parties. Martinez, a member of the group that had confronted Barth, punched Barth in the nose. Barth sustained injuries as a result of her altercation with Martinez.

Several months after the incident, Barth brought suit against Buckets and Coleman. In an amended complaint, Barth alleged that Buckets had breached its duty of care to keep the premises reasonably safe. Barth also alleged that Coleman had been negligent by failing to notify the police department of the altercation when it began and by failing "to otherwise stop or control the incident." After trial, the district court found that Coleman's negligence in failing to monitor the situation or prevent the incident from escalating was a proximate cause of Barth's injuries and that Coleman was acting within the scope of his employment at all times material to the lawsuit. As a result, the district court found that Coleman and Buckets were jointly and severally liable for Barth's injuries in the amount of $5000, and entered judgment accordingly.

The second issue in this case pertains to an insurance contract between Evanston and Buckets. Shortly before the incident between Barth and Martinez occurred, Coleman met with Tina Marie Milligan (Milligan) to acquire a policy of premises liability insurance for Buckets. Coleman specifically asked Milligan, who was employed by the GDA Insurance Agency (GDA), to obtain premises liability insurance that would cover assaults and batteries occurring between customers on Buckets's premises. After trying unsuccessfully to procure insurance from three different New Mexico insurance carriers, Milligan contacted the ADCO General Corporation (ADCO), a surplus lines broker located in Colorado and New Mexico. Pursuant to ADCO's request, Milligan sent an executed insurance application to ADCO, which, in turn, forwarded the application to Evanston. Evanston, a surplus lines insurer, authorized ADCO to issue a premises liability insurance policy to Buckets. Liability arising from assaults and batteries and liability for negligent hiring and supervision in connection with assaults and batteries was excluded from the coverage.

Following notification from Barth that she intended to sue, Coleman had GDA send a notice of claim to ADCO. After receiving the notice, Evanston denied that the claim was covered and intervened in Barth's action against Coleman and Buckets. Following trial on this matter, the district court found and concluded that the insurance policy issued by Evanston to Buckets excluded coverage for negligent supervision that resulted in assault and battery. Based upon its conclusion that Barth's damages arose from negligent supervision resulting in an assault and battery, the district court concluded that Barth's injuries were not covered under the insurance policy. Consequently, the district court granted declaratory judgment in Evanston's favor and awarded court costs. Coleman and Buckets appeal from the district court's judgment in favor of Barth and its judgment in favor of Evanston.

## II.

We begin by addressing whether the district court erred when it awarded Barth damages of $5000 against Coleman and Buckets, jointly and severally, without allocating a percentage of fault to Martinez and Barth. Coleman and Buckets first contend that the district court erred by failing to allocate a percentage of fault to Martinez, who committed an intentional tort when she hit Barth in the nose. In essence, Coleman

and Buckets assert that the principles of comparative negligence and the policy underlying the doctrine require that Martinez be allocated a percentage of fault for causing injury to Barth. We agree.

In the recent case of *Reichert v. Atler,* 117 N.M. 623, 875 P.2d 379 (1994), this Court addressed whether the fault of a premises owner who negligently failed to protect patrons from foreseeable harm should be compared to the fault of a third party tortfeasor who actually caused the harm. In *Reichert,* a patron of the A–Mi–Gusto Lounge, Alfredo Castillo, was shot to death in the bar by another patron, Pablo Ochoa, after an argument between the two patrons occurred. The personal representative of Castillo's estate sued the owners of the lounge, claiming that the lounge failed to provide adequate security and that an employee observed the fight and made no attempt to stop the fight or summon the police. After trial, the district court found the owners of the bar fully liable for Castillo's death. The Court of Appeals reversed the judgment. We granted certiorari and affirmed the Court of Appeals to the extent that "the negligence of a bar owner may be compared to the conduct of a third party." 117 N.M. at 624, 875 P.2d at 380. We declined, however, to adopt the Court of Appeals' rationale discussing whether comparative-fault principles are applied when an intentional tort is involved. Instead, we held that the issue of "whether the conduct of the third party [tortfeasor] is intentional, negligent, or otherwise is not determinative in the application of comparative-fault principles in situations similar to the one presented in this case." *Id.*

In *Reichert,* 117 N.M. at 624, 875 P.2d at 380, we recognized that a premises owner has an important duty to protect patrons from injury caused by third parties:

[T]he proprietor of a place of business who holds it out to the public for entry for his business purposes, [while not an insurer against personal injuries inflicted upon patrons by third persons,] is subject to liability to guests who are upon the premises and who are injured by the harmful acts of third persons if, by the exercise of reasonable care, the proprietor could have discovered that such acts were being done or about to be done, and could have protected [the injured guest or patron from] … injury by controlling the conduct of the other patron.

*Coca v. Arceo,* 71 N.M. 186, 189, 376 P.2d 970, 973 (1962); *see also Valdez v. Warner,* 106 N.M. 305, 307, 742 P.2d 517, 519 (Ct. App.), *cert. quashed,* 106 N.M. 353, 742 P.2d 1058 (1987). Notwithstanding the importance of the premises owner's duty of care, we concluded that "public policy would support a holding that the bar owner may reduce his liability by the percentage of fault attributable to a third party." *Reichert,* 117 N.M. at 625, 875 P.2d at 381. We found this analysis consistent with this Court's adoption of comparative negligence, *see Scott v. Rizzo,* 96 N.M. 682, 689–90, 634 P.2d 1234, 1241–42 (1981), and with the rejection of joint and several liability in comparative negligence cases, *see Bartlett v. New Mexico Welding Supply, Inc.,* 98 N.M. 152, 159, 646 P.2d 579, 586 (Ct.App.), *cert. denied,* 98 N.M. 336, 648 P.2d 794 (1982). *Reichert,* 117 N.M. at 623–624, 875 P.2d at 380–381.

In *Reichert,* we rejected cases from other jurisdictions refusing to apportion fault between the negligent defendants and intentional tortfeasors under the principle that "[n]egligent tortfeasors should not be allowed to reduce their fault by the intentional fault of another that they had a duty to prevent." *Kansas State Bank & Trust Co. v. Specialized Transportation Services, Inc.,* 249 Kan. 348, 819 P.2d 587, 606 (1991); *see also Loeb v. Rasmussen,* 822 P.2d 914, 918–19 (Alaska 1991) (holding that the adoption of comparative negligence did not change the rule that a minor's contributory negligence in an illegal liquor transaction would not prevent a tort claim against a liquor licensee); *Gould v. Taco Bell,* 239 Kan. 564, 722 P.2d 511, 516 (1986) (reasoning that "the intentional acts of a third party cannot be compared with the negligent acts of a defendant whose duty it is to protect the plaintiff from the intentional acts committed by the third party"); *M. Bruenger & Co. v. Dodge City Truck Stop, Inc.,* 234 Kan. 682, 675 P.2d 864, 867–70 (1984) (concluding that the trial court erred by requiring the jury to compare the negli-

gence of a bailee with the intentional conduct of a thief who stole and subsequently destroyed a tractor-trailer rig left in the bailee's possession). The rule of law stated in these cases was rejected because it is inconsistent with New Mexico's adoption of comparative fault and abolition of joint and several liability. In *Reichert,* we noted that "each individual tortfeasor should be held responsible only for his or her percentage of the harm." 117 N.M. at 624, 875 P.2d at 381; *Bartlett,* 98 N.M. at 159, 646 P.2d at 586. We concluded that the jury should decide how the owner's duty to protect patrons relates to the conduct of third party tortfeasors and suggested that the following jury instruction be used to aid the jury in applying comparative fault principles in similar cases:

> If you find that the [owner] [operator] of the [place of business] breached [his] [her] [its] duty to use ordinary care to keep the premises safe for use by the visitor, you may compare this breach of duty with the conduct of the third person(s) who actually caused the injury to the plaintiff(s) and apportion fault accordingly. In apportioning this fault, you should consider that the [owner's] [operator's] duty to protect visitors arises from the likelihood that a third party will injure a visitor and, as the risk of danger increases, the amount of care to be exercised by the [owner] [operator] also increases. Therefore, the proportionate fault of the [owner] [operator] is not necessarily reduced by the increasingly wrongful conduct of the third party.

*Reichert,* 117 N.M. at 625, 875 P.2d at 382.

■ Today, we reaffirm the principles discussed in *Reichert.* The district court's judgment holding Coleman and Buckets solely liable for Barth's damages must be reversed. In the instant case, Coleman and Buckets clearly breached their duty to protect Barth from injury caused by other patrons. Coleman and Buckets failed to take any action designed to control the conduct of the individuals confronting Barth or to otherwise protect Barth from injury after repeatedly being appraised of the impending confrontation. However, imposing full liability on Buckets and Coleman for Barth's damages,

when Martinez was the actual cause of Barth's injuries, would be inconsistent with holding tortfeasors responsible only for their percentage of fault. We hold that Buckets's and Coleman's liability for the injuries sustained by Barth must be reduced by the percentage of fault attributable to Martinez.

Coleman and Buckets also argue that the judgment should be reduced in proportion to Barth's fault. Our review of the record indicates that the district court made no ruling on the comparative negligence of Barth. If Barth's fault contributed to her injuries, the liability of Buckets and Coleman should be offset by her percentage of fault. *See* NMSA 1978, § 41–3A–1(B) (Repl.Pamp.1989) ("[A]ny defendant who establishes that the fault of another is a proximate cause of a plaintiff's injury shall be liable only for that portion of the total dollar amount awarded as damages to the plaintiff that is equal to the ratio of such defendant's fault to the total fault attributed to all persons, including plaintiffs, defendants and persons not party to the action."); *Scott,* 96 N.M. at 689–90, 634 P.2d at 1241–42 (requiring that the plaintiff's recovery of total damages be reduced by the percentage of plaintiff's contributing fault). On remand, the district court may be able to determine Barth's comparative fault from the record, or it may be necessary to conduct further proceedings to determine such fault. We remand this case to the district court for a determination of Martinez's and Barth's percentages of fault. The court must then reduce Buckets's and Coleman's liability in accordance with the percentages of fault attributable to Martinez and Barth.

### III.

We next address whether the district court erred when it concluded that Barth's injuries were not covered under the insurance policy issued by Evanston to Buckets. Evanston issued an "Owners, Landlords & Tenants Liability Insurance" policy to Buckets prior to the time that Barth was injured at the nightclub. The liability policy contained an assault and battery exclusion that stated:

> [T]he insurance does not apply to bodily injury or property damage arising out of assault and battery or out of any act or

omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of the insured, his employees, patrons or any other person.

The district court concluded that this clause was effective to exclude coverage for the damages sustained by Barth and granted declaratory judgment in Evanston's favor.

On appeal, Buckets argues that the district court erred when it decided that coverage for Barth's damages was excluded under the liability policy. Buckets maintains that Coleman, acting on Buckets's behalf, specifically told Milligan that he wanted insurance that would cover assault and battery incidents between patrons. However, the policy issued by Evanston, by excluding coverage for assault and battery, failed to conform to the requested coverage. In essence, Buckets asserts that the policy should be deemed to cover Barth's damages notwithstanding the exclusion because the policy issued by Evanston did not conform to the coverage Coleman requested.

■ When deciding whether an exclusionary clause is effective to nullify coverage under an insurance policy, we give consideration to the reasonable expectations of the insured. *Knowles v. United Servs. Auto. Ass'n*, 113 N.M. 703, 705, 832 P.2d 394, 396 (1992); *Jimenez v. Foundation Reserve Ins. Co.*, 107 N.M. 322, 324–25, 757 P.2d 792, 794–95 (1988). In this case, there is no ambiguity caused by the language of the policy itself. The policy clearly excluded coverage for assault and battery. Barth's damages resulted from an assault and battery. Under the literal terms of the policy, Barth's damages would not be covered. This analysis of the policy language does not, however, end our inquiry.

■ The doctrine of reasonable expectations is not restricted to those cases in which the policy language is at issue. *See INA Life Ins. Co. v. Brundin*, 533 P.2d 236, 242 (Alaska 1975) (noting that "[a] lay person's expectations of insurance coverage are of course formed by many factors besides the language of the policies themselves."). Often, the dynamics of the insurance transaction, and not

the language of the contract itself, determine what the reasonable expectations of the insured are. *See Collister v. Nationwide Life Ins. Co.*, 479 Pa. 579, 388 A.2d 1346, 1354 (1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979); *see also Brundin*, 533 P.2d at 242 (concluding that an insured's expectations were at least partially generated by printed advertising flyers describing coverage). Accordingly, courts must "examine the dynamics of the insurance transaction to ascertain what are the reasonable expectations of the consumer." *Collister*, 388 A.2d at 1354.

In the instant case, the parties transacted to purchase and sell surplus lines insurance. Surplus lines insurance is insurance placed with a qualified foreign insurer not otherwise authorized to sell insurance in New Mexico. *See* NMSA 1978, § 59A–14–1(A) (Repl. Pamp.1992). Surplus lines insurance will be sold to an insured if the particular amount or type of insurance sought to be purchased "cannot be obtained from insurers authorized to do business in this state." NMSA 1978, § 59A–14–3(C) (Repl.Pamp.1992). This type of insurance is sold through a series of intermediaries acting between the prospective insured and the ultimate insurer. In each transaction, the surplus lines insurance must be procured through a licensed surplus lines broker. Section 59A–14–3(A). Another intermediary usually involved in the transaction is the producing broker, who deals directly with the prospective insured. NMSA 1978, § 59A–14–2(C) (Repl.Pamp.1992).

With regard to the particular transaction in this case, the sale of liability insurance from Evanston to Buckets took place through a series of intermediaries, as contemplated by the statutes regulating the sale of surplus lines insurance. Coleman originally contacted Milligan, who, as an employee of GDA, functioned as the producing broker. Coleman told Milligan that he wanted to buy premises liability insurance for Buckets covering assault and battery incidents between patrons on Buckets's premises. Milligan, after unsuccessfully attempting to place the risk with several insurance carriers authorized to write insurance in New Mexico, contacted ADCO, a surplus lines broker with an

**6**

office in Colorado and a resident office in New Mexico. ADCO, which represented Evanston and other surplus lines carriers, requested GDA, through Milligan, to obtain a completed and executed application for general liability insurance. Milligan completed the application, which requested only premises operation insurance, and forwarded the application to ADCO. ADCO, in turn, forwarded the application to Evanston, which then issued Buckets a policy of premises liability insurance that excluded coverage for liability arising from assaults and batteries.

■ Throughout this transaction, Coleman was left uninformed about the nature of what he was purchasing, how the policy was being procured, and which company he was purchasing the policy from. Milligan testified that she never told Coleman that he was purchasing surplus lines insurance, never explained what surplus lines insurance was, never discussed the risks associated with purchasing such insurance, and never revealed how the surplus lines system worked. Milligan testified that she never explained to Coleman the distinct roles that GDA, ADCO, and Evanston played in the procurement of Buckets's insurance policy. Milligan also testified that she did not receive the policy before the Barth incident and that there was no realistic way for Coleman to receive information about the contents of the insurance policy prior to the incident. In addition, Richard Thomas, president of ADCO, testified, and our examination of the record confirms, that Evanston was not clearly identified as the insurer on the policy issued to Buckets, despite statutory requirements that the surplus lines broker promptly deliver to the insured the policy or other evidence of insurance setting forth, among other things, "the name and address of the surplus lines insurer."[1] *See* NMSA 1978, § 59A–14–14(A) (Repl.Pamp.1992).

Not surprisingly, Coleman testified that he saw no distinction between Milligan, GDA, ADCO, and Evanston. Coleman testified that he had no notice that the policy contained an assault and battery exclusion prior

to the fight between Barth and Martinez. Coleman's testimony revealed that he did all that he thought he had to do to procure insurance covering assaults and batteries between patrons when he communicated to Milligan the type of insurance that he needed.

We believe that the particular insurance transaction in this case gave rise to a reasonable expectation that the policy issued by Evanston would conform to the insurance that Coleman had requested. The insured's expectations were in large degree created by the intermediaries involved in the transaction. *See Collister,* 388 A.2d at 1353 (recognizing that "the expectations of the insured are in large measure created by the insurance industry itself"); *Allen v. Metropolitan Life Ins. Co.,* 44 N.J. 294, 208 A.2d 638, 642 (1965) (noting that insurance industry practices often mislead lay persons purchasing insurance). Both Milligan, by not revealing to Coleman the nature of surplus lines insurance and by not explaining the different roles that the intermediaries and insurer played in the insurance transaction, and ADCO, by failing to clearly disclose in the policy that Evanston was the ultimate insurer, created the perception that GDA, ADCO, and Evanston were one and the same. After Coleman communicated to GDA that he needed insurance to cover altercations between Buckets's patrons, Coleman and Buckets had a reasonable expectation that the insurance policy issued by Evanston would cover damages such as those incurred by Barth.

The legislature has declared that one purpose for regulating surplus lines brokers and surplus lines insurers is to "protect[ ] insureds and persons seeking insurance in this state." Section 59A–14–1(C)(1). In light of the legislature's purpose to protect the insured, and because Buckets had a reasonable expectation of coverage under the facts of this case, Evanston must assume responsibility for inadequate insurance coverage resulting from miscommunications made between intermediaries during the process of selling insurance to the insured. *Cf. Sparks v. St. Paul Ins. Co.,* 100 N.J. 325, 495 A.2d 406, 413

1. The only reference to Evanston on the Certificate of Insurance issued by ADCO to Buckets is the typed name "Evanston" in a box reserved for

listing the "Company or Underwriter." No full company name, address, or phone number for Evanston was listed.

(1985) (noting that because the insurer, unlike the insured, is an expert in its field, the insured is justified in placing heavy reliance on the knowledge and good faith of the company, and the insurer bears a heavy responsibility to the insured to see that the insured's reasonable expectations are not frustrated); Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 6.3, at 635 (1988) (concluding that under some circumstances "it is appropriate to protect expectations which result from the marketing practices of the insurer"). Accordingly, we hold that Barth's damages are covered under the policy of insurance issued by Evanston to Buckets notwithstanding the assault and battery exclusion.

We note that the district court found that GDA and Milligan acted as agents for Buckets in procuring the policy of insurance from Evanston and concluded that "[a]ny information conveyed by Coleman to Milligan or GDA is not imputed to Evanston." Thus, under the district court's findings and conclusions, Buckets would bear the loss for the miscommunications made between GDA and ADCO.

We are troubled by the district court's conclusion that Coleman's communications to GDA about the type of insurance he wanted to buy were not imputable to Evanston. Milligan and GDA together functioned as the producing broker in the transaction between Coleman and Evanston. We find no New Mexico statute or case that decides whether a producing broker in a surplus lines insurance transaction is considered the agent of the insurer or the insured. The rule under general principles of insurance law is that an insurance broker represents the insured. 16 John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 8725, at 333 (Rev. Vol.1981); Keeton, *supra* § 2.5(b)(3), at 83. Nonetheless, some cases support the opposite conclusion. *See, e.g., Tiner v. Aetna Life Ins. Co.,* 291 So.2d 774, 776–78 (La.1974) (holding that an insurance broker's knowledge and acts were imputed to an insurer and that the broker acted as the agent for the insurer when the broker generally did everything necessary to facilitate the purchase and sale of the insurance policy); *Morrison v. Swenson,* 274 Minn. 127, 142 N.W.2d 640, 642–47 (1966) (upholding the trial court's determination that an insurance salesman, not licensed as an agent of the insurer, nonetheless functioned as the insurer's agent when the evidence showed that all information received by the insured indicated that the salesman was the insurer's agent and the salesman received his payment from the insurer in the form of a commission); *Southeastern Fidelity Ins. Co. v. Gann,* 340 So.2d 429, 430–33 (Miss.1976) (concluding that an insurance broker, who procured insurance for the insured from nonadmitted insurers, became the agent of the insurers under principles of general agency law when the broker acted on behalf of the insurers in placing the insurance and the insurers "accepted his services by issuing the coverage"). The inconsistency between the general rule that an insurance broker represents the insured and the cases deciding that a broker is the agent of the insurer demonstrates that general agency principles are difficult to apply and often are erroneously applied in cases in which insurance is sold through intermediaries. As one treatise on insurance law notes:

> The relationships between insurance companies and sales representatives in regard to the authority to contract on behalf of insurers have been established in a multitude of patterns that often cannot be accurately described or characterized by the terms that are generally used to define relationships in agency law. Thus, a fundamental error can result in some instances when a concept from agency law is applied to a disputed insurance transaction as if it were a universally applicable general proposition. In general, considerable skepticism should be applied to any assertion that a particular result in an insurance dispute is warranted by the law that governs agency relationships.

Keeton, *supra* § 2.5(b), at 81. We find substantial evidence in the record to support the district court's finding that GDA and Milligan were, in some sense, agents for Buckets. We conclude, however, that this finding is not conclusive on whether Buckets should bear responsibility for the miscommunications made during the transaction in this case.

GDA performed an ambiguous, if not dual, role in the distribution of insurance from Evanston to Buckets. *See* Appleman, *supra* § 8725, at 333–34 (recognizing that an intermediary may at different times represent the applicant for insurance and at other times act for the insurer); *American Fire & Indem. Co. v. Lancaster,* 286 F.Supp. 1011, 1014 (E.D.Mo.1968) (noting that a broker "may be the agent for the insurer for a certain purpose and of the insured for another purpose"), *aff'd,* 415 F.2d 1145 (8th Cir.1969). GDA and ADCO, each performing their respective jobs in the surplus lines distribution process, controlled the process whereby Evanston was chosen as the insurer. As contemplated by the surplus lines system, *see* NMSA 1978, § 59A–14–9(A) (Repl. Pamp.1992), the record indicates that GDA was compensated by commission checks issued by ADCO, Evanston's agent, rather than by payment from Coleman. *See Morrison,* 142 N.W.2d at 646 (considering as relevant the fact that an insurance salesman was compensated by a commission paid by the insurer, when determining that the salesman, not a licensed agent of the insurer, was in fact functioning as the insurer's agent). Buckets, by contrast, had little or no control over the intermediaries involved, limited control of the application process, and no input into who was selected as the ultimate insurer.

Under the facts of this case, GDA functioned in some respects as an agent for Evanston. We hold that the district court erred when it concluded that the coverage information conveyed by Coleman to Milligan and GDA was not imputed to Evanston, and that coverage for Barth's injuries was therefore excluded. We reverse the district court's declaratory judgment concluding that the insurance policy issued by Evanston to Buckets did not provide coverage for Barth's damages. We remand this case for proceedings consistent with this opinion.

**IT IS SO ORDERED.**

MONTGOMERY, C.J., and RANSOM, FRANCHINI and FROST, JJ., concur.