2002-NMCA-046

44 P.3d 538

**Nicholas J. BERLANGIERI and Carol C. Berlangieri, Plaintiffs,**

and

**Western World Insurance Company, Intervenor–Appellee,**

v.

**RUNNING ELK CORPORATION; Second Running Elk Corporation, d/b/a the Lodge at Chama, Defendants–Appellants.**

No. 21,698.

Court of Appeals of New Mexico.

March 5, 2002.

P. Scott Eaton, Eaton Law Office, Albuquerque, NM, for Appellee.

Wayne E. Bingham, Crider, Bingham & Hurst, P.C., Albuquerque, NM, for Appellants.

## OPINION

SUTIN, Judge.

{1} Running Elk Corporation's insurance policy issued by Western World Insurance Company contained an express written exclusion of coverage for liability claims arising from guest horseback riding injuries. The trial court granted summary judgment of no coverage. Running Elk appeals. We address whether summary judgment was appropriate in the face of Running Elk's contention that the dynamics of the insurance transaction raised a genuine issue of material fact as to Running Elk's reasonable expectation of coverage. We affirm.

## BACKGROUND

{2} The Jicarilla Apache Indian Tribe (the Tribe) purchased a ranch known as the Chama Land & Cattle Co. (Chama) in June 1995 out of a bankruptcy proceeding. This included the Lodge at Chama (the Lodge). The Tribe leased the Lodge to Running Elk Corporation (Running Elk).[1] Frank Simms was hired in 1990 as the general manager of the Lodge, continued as general manager during the bankruptcy proceedings, and was retained by the Tribe to continue in his capacity as general manager of the Lodge, running its day-to-day operations.

{3} In May 1996, a guest at the Lodge, Nicholas Berlangieri, was injured when he fell from one of the Lodge's horses. Berlangieri sued Running Elk in negligence.[2] Western World Insurance Company (Western), Running Elk's liability insurer, agreed to defend Running Elk under a reservation of rights and intervened in the action seeking a declaratory judgment that the insurance policy did not cover the accident. It is this coverage issue that requires a recitation of the following undisputed historical facts.

{4} A Western general liability policy for the Lodge providing coverage for the period December 31, 1994, to December 31, 1995, was already in effect at the time the Tribe acquired the Lodge. A renewal policy, which was the Western policy in effect at the time of the Berlangieri accident, provided coverage for the period June 30, 1995, to June 30,

---

1. Berlangieri sued two entities, Running Elk Corporation, a New Mexico corporation, and Second Running Elk Corporation, a foreign corporation, and alleged they "or either of them" were operating the Lodge. The two Defendant entities admitted this averment. We refer to both entities as "Running Elk."

2. The trial court granted summary judgment dismissing Berlangieri's negligence action based on Berlangieri's having signed an exculpatory contract document by which he agreed in advance to release the Lodge from liability in negligence. Berlangieri appealed that dismissal in Court of Appeals Docket No. 21,807, now pending before this Court.

1996. A third Western policy renewed coverage for the Lodge for the period June 30, 1996, to June 30, 1997.

{5} Gail Bundy, a self-employed independent insurance agent, who was the insurance agent for the Tribe beginning in 1986, reviewed the Tribe's insurance coverages, and was involved in obtaining the Western renewal policies. The Tribe instructed Bundy to go to the Lodge and identify insurance needs. Simms's role was to provide factual information to Bundy, who was considered by Simms to be "[t]he Lodge's insurance agent." Simms "was the on-site person to deal with" in regard to insurance.

{6} Bundy and Simms discussed the Lodge's operations and reviewed its existing coverage. The Lodge advertised and provided a number of activities for its guests, including horseback riding, hunting, fishing, hiking, and other activities. The Lodge's advertising brochure advertised that "Chama is a trail rider's dream!" and stated horseback riding was a part of hunting activity. Bundy was aware of the horseback riding activity. Simms relied on Bundy to identify insurance issues that the Lodge needed to address. When asked whether he would read through policies brought to him by Bundy, Simms answered, "Typically, I think he would and I would discuss the general issues. Would I read the policy from front to back? No." When asked if he leafed through the pages, Simms answered, "Yeah. To the extent that it was possible, yes."

{7} Bundy dealt with Floyd West & Company (Floyd West), a Texas surplus lines brokerage firm that served as Western's underwriter and representative. Bundy mailed the Lodge's brochure to Floyd West or Western.

{8} The coverage language on page one of both the first and the second Western policies obligated Western to pay "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' ... to which this insurance applies." The second policy specifically listed the policy's exclusions and endorsements on its third page, including a "Saddle Animal Liability Exclusion." Other exclusions were listed, including those for liquor liability and assault and battery liability. The full Saddle Animal Liability Exclusion was set out in the first and second policies in a separate endorsement. The endorsements stated: "This Endorsement Modifies Your Policy" and

This insurance does not apply to any claim arising from Bodily Injury to any person incurred while mounting, riding, attempting to ride or dismounting any saddle animal.

This exclusion does not apply if the saddle animal is hand-led by an employee of the insured or if the animal is tethered to a walking device.

Saddle animals include, but are not limited to, horses, ponies, donkeys, mules, camels, elephants, ostriches and llamas.

{9} At his deposition, Simms could not recall whether he discussed the Saddle Animal Liability Exclusion with Bundy.

Q. Did Mr. Bundy ever discuss with you this particular exclusion right here that's labeled "Saddle animal liability exclusion"?

A. Mr. Bundy and I discussed saddle animal liability. Whether it was relative to this policy or subsequent policies, I can't say.

Q. Okay. Do you recall whether you discussed that with him before Mr. Berlangieri's accident or after?

A. Well, I know we discussed saddle animal liability after the accident.

Q. Okay.

A. Whether we discussed it prior to the accident, I can't say.

Q. You just don't remember?

A. Well, I—no. I don't remember.

. . . .

A. At some point in time post-accident, I became aware of the exclusion. Pre-accident, I can't say. I find it highly improbable that I would file a claim and notice of claim to [Gail] Bundy, who told me he would file the claim with Western World, and I don't know why I would file a claim if I knew that Western World had an exclusion.

In answer to a question whether Simms "at any time" sat down with Bundy and read through the exclusion, Simms stated:

A. Post-accident, [Gail] Bundy and I were searching for saddle animal liability.

Q. Right.

A. Pre-accident, I cannot state honestly that I knew or did not know that the coverage was or was not afforded under—

This deposition testimony was taken in July 1999. Running Elk filed an affidavit signed by Simms on February 3, 2000. The affidavit states:

2. On May 29, 1996, I believed The Lodge at Chama had insurance coverage for horseback riding because The Lodge's insurance agent Gail Bundy knew that one of The Lodge's activities was horseback riding.

3. Mr. Bundy had in his possession The Lodge's advertising brochure where horseback riding was advertised. I assumed from this that The Lodge's insurance company, Western World, knew of this activity.

4. At no time before May 29, 1996, do I recall Gail Bundy discussing with me any Saddle Animal Liability Exclusion...."

. . . .

8. At no time before or after May 29, 1996, did I conclude that insurance coverage for horseback riding was not necessary for The Lodge.

{10} Primarily on the strength of Simms's deposition testimony and affidavit, Running Elk contended below that it had a reasonable expectation that saddle animal liability coverage would be afforded. The trial court refused to give any weight to Simms's affidavit, and determined, as a matter of law, that the remaining evidence could not support such a reasonable expectation. The trial court specifically determined that:

. . . . In this case, there was no specific request for saddle animal coverage; at best there was a general request for "blanket" coverage. This general request could not support the insured's "reasonable expectation" because the Defendants were simultaneously engaged in difficult negotiations to secure liquor liability coverage, proving that the Defendants knew that "blanket" coverage was not readily available.

. . . . [N]o reasonable person could expect that providing a brochure meant for the consumer to an insurance company would inform the [insurer] of any specific coverage requested.

. . . . Defendants had been in possession of the policy long before Berlangieri's accident and Simms admits he read it, albeit none too closely.

{11} Based on the Saddle Animal Liability Exclusion, the trial court entered summary judgment based on no coverage for the Berlangieri accident.

## DISCUSSION

{12} Running Elk contends the court erred in determining as a matter of law that it could not have reasonably expected saddle animal liability coverage to exist. On appeal, we review de novo the grant of summary judgment. *Barncastle v. Am. Nat'l Prop. & Cas. Cos.*, 2000–NMCA–095, ¶ 5, 129 N.M. 672, 11 P.3d 1234. If no genuine issue of material fact exists, the moving party is entitled to judgment as a matter of law. *Dunn v. McFeeley*, 1999–NMCA–084, ¶ 11, 127 N.M. 513, 984 P.2d 760.

{13} The doctrine of reasonable expectations may be invoked when the language of an insurance policy or representations of the insurance company lead an insured to reasonably expect coverage. *See, e.g., Barth v. Coleman*, 118 N.M. 1, 5, 878 P.2d 319, 323 (1994); *Martinez v. Allstate Ins. Co.*, 1997–NMCA–100, ¶ 11, 124 N.M. 36, 946 P.2d 240. Judgment against an insured is appropriate as a matter of law when the alleged reasonable expectations do not extend to the facts of the case, or when the insured's reading of the policy is not reasonable. *Samora v. State Farm Mut. Auto. Ins. Co.*, 119 N.M. 467, 470–71, 892 P.2d 600, 603–04 (1995); *Martinez*, 1997–NMCA–100, ¶ 11, 124 N.M. 36, 946 P.2d 240. The doctrine of reasonable expectations is available where policy language is ambiguous. *See, e.g., Rummel v. Lexington Ins. Co.*, 1997–NMSC–041, ¶¶ 21–22, 123 N.M. 752, 945 P.2d 970. The doctrine is also available

when the "dynamics of the insurance transaction" make way for its application. *Barth,* 118 N.M. at 5, 878 P.2d at 323.

{14} We see no ambiguity in the Western policy created by the existence of the coverage language on page one of the policy and the Saddle Animal Liability Exclusion. The Saddle Animal Liability Exclusion in the Western policy is express, clear, and unambiguous. The coverage language on page one does not create an ambiguity. The unambiguous exclusion was in the first Lodge policy that was in effect at the time of the bankruptcy as well as in the second Lodge policy, and Running Elk had these policies in its possession for a considerable time. This is in no way a circumstance in which it is the small, fine print on the repetitively printed page of a mass-produced policy that might be passed over by the insured upon receipt. The policies here contain typewritten insertions on the declarations pages mentioning endorsements "applying to this policy and attached at time of issue." Behind the declarations page of the second policy is a list of the endorsements and exclusions. Each policy contains the respective endorsements and exclusions.

{15} Unambiguous insurance policy exclusions are to be enforced unless they are contrary to law or public policy. *Martinez,* 1997–NMCA–100, ¶ 14, 124 N.M. 36, 946 P.2d 240; *Stinbrink v. Farmers Ins. Co.,* 111 N.M. 179, 181, 803 P.2d 664, 666 (1990). The Saddle Animal Liability Exclusion is not contrary to law or public policy. Running Elk does not argue that it is. Running Elk must look to factors beyond the policy language. *See Barth,* 118 N.M. at 5, 878 P.2d at 323 (determining the policy language was unambiguous, and stating "[t]he doctrine of reasonable expectations is not restricted to . . . the policy language").

{16} Running Elk argues that "most of the testimony that creates a genuine issue of material fact comes directly from Mr. Simms'[s] deposition testimony." It says that Simms's affidavit "simply clarifies some issues, and provides additional testimony concerning the facts." Running Elk then summarizes what the facts are:

[T]hat Mr. Simms believed The Lodge had a whole policy with Western World, that Mr. Simms thought The Lodge had full coverage, and that Mr. Simms thought he was buying saddle animal coverage, and that The Lodge's insurance policy was all inclusive. Frank Simms relied upon Gail Bundy for The Lodge's insurance needs. Mr. Simms thought The Lodge had blanket coverage before the Berlangieri accident, and if Mr. Bundy had told Mr. Simms there was a saddle animal exclusion he would have told Mr. Bundy to find coverage.

{17} We are unpersuaded by this apparent attempt to create a genuine issue of material fact. The clear tenor of Simms's deposition testimony was that he could not remember whether he discussed saddle animal liability coverage with Bundy before the accident occurred. Simms said he could not state whether he knew or did not know if coverage existed. In his affidavit, Simms stated only that he believed such coverage existed as of the date of the accident. Consistent with his deposition testimony he also stated he did not recall Bundy discussing the Saddle Animal Liability Exclusion before the accident.

{18} Running Elk argues that Simms's affidavit is important because it refutes Bundy's deposition testimony that horseback riding was not an important part of the Lodge's operations and that he and Simms discussed the Saddle Animal Liability Exclusion. In addressing the propriety of summary judgment, we have accepted Simms's version of the facts wherever they conflict with Bundy's recollection. While we do not find Simms's affidavit to be inconsistent with his deposition testimony, we also are of the opinion that it does not add anything material to his deposition testimony. Therefore, the trial court's refusal to consider the affidavit was harmless.

{19} What remains is whether Simms's subjective expectation was objectively reasonable. *See Rodriguez v. Windsor Ins. Co.,* 118 N.M. 127, 130, 879 P.2d 759, 762 (1994) ("[W]hen we speak of the insured's reasonable expectations we refer to what the hypothetical reasonable insured would glean from the wording of the policy and the kind of

insurance at issue, rather than how the particular insured who happens to buy the policy might understand it."). Running Elk relies on the language in *Barth* requiring a court to " 'examine the dynamics of the insurance transaction to ascertain what are the reasonable expectations of the consumer.' " 118 N.M. at 5, 878 P.2d at 323 (quoting *Collister v. Nationwide Life Ins. Co.*, 479 Pa. 579, 388 A.2d 1346, 1354 (1978)).

{20} Running Elk interprets "dynamics" to include Bundy's knowledge of Lodge operations, Simms's reliance on Bundy to raise issues regarding insurance needs, and Simms's silent expectations. Running Elk is in no position to rely on Bundy's knowledge or alleged failure to advise Simms. In this case Bundy was Running Elk's agent. The evidence does not support any determination that Bundy was Western's agent or that Western had any reason to know of Simms's subjective expectation of coverage. We see no "dynamics" in these circumstances of Bundy's relationships that can give rise to any reasonable expectation of coverage.

{21} Furthermore, limiting *Barth* to the facts and circumstances as the Court viewed them, the circumstances in *Barth* were significantly different from those in the present case. The most critical of these significantly different circumstances is that, in *Barth*, the insured, a bar, specifically requested "premises liability insurance that would cover assaults and batteries occurring between customers." *Id.* at 2, 878 P.2d at 320. In view of this request, the insured expected that the requested coverage would be forthcoming. The insured in *Barth* was not informed of the agent's difficulty in obtaining insurance coverage. The assault upon a customer for which the insured sought coverage occurred before the insured received the policy or otherwise could have discovered the exclusion of specifically requested coverage for assaults between customers. *Id.* at 6, 878 P.2d at 324.

{22} Running Elk incorrectly states that "Bundy was asked to obtain blanket coverage." Nowhere in the record is there evidence that Simms or the Tribe asked Bundy to obtain blanket coverage. As for the Tribe, no evidence exists of any communication to Bundy or to Simms in that regard. As for Simms, the most that he was able to say was that he assumed and believed blanket coverage existed, that (based on no communication on the matter) he relied on Bundy to obtain blanket coverage, and that if he had thought saddle animal liability coverage was excluded he would immediately have told Bundy to find such coverage. The trial court concluded Simms's silent belief that Western was providing an all-inclusive, blanket policy to be unreasonable, a conclusion with which we agree. Western's policies indisputably did not provide inclusive or blanket coverage for the Lodge. The circumstances here are not those in *Barth*, where the independent agent was undeniably instructed to obtain assault and battery coverage, the coverage request was somehow lost in the process, and the insured had no opportunity before the incident to inspect the policies that had been issued with an assault and battery liability exclusion.

{23} Further, in *Barth* the insured's general manager "was left uninformed about the nature of what he was purchasing, how the policy was being procured, and which company he was purchasing the policy from." *Id.* at 6, 878 P.2d at 324. In the present case, in stark contrast, Western had been the insurer through whatever agent the bankruptcy trustee used while Chama was in bankruptcy. The Tribe was "pretty well stuck with what the bankruptcy people had already had in place," which was the December 1994—December 1995 policy. In June 1995 there had been no opportunity to find or success in finding another insurance company to provide insurance. The Tribe "just took the Western World policy ... by what they call a letter of record" which "just changes the agent for the insurance company." The June 1995—June 1996 policy was simply a renewal. By possession of both the December 1994—December 1995 policy and the June 1995—June 1996 policy, had or should be held to have had knowledge of the insurance purchased by the Lodge.

{24} The broad *Barth* dynamics-of-the-insurance-transaction language cannot apply here to create an issue of fact. Running Elk did not show any document, conversation, or

circumstance that could create an objectively reasonable expectation that saddle animal liability coverage would exist. The Tribe did not obtain the policy through any initial application process or based on any representation of the insurer, much less based on a representation of the insurer that was contrary to a written policy exclusion. The Tribe and Running Elk had ample time to review the coverages and exclusions. They did not bring to the attention of Bundy or the insurer that saddle animal liability was not covered or that the Saddle Animal Liability Exclusion should be removed. This is not a case involving the apparent authority of an insurer's agent to bind the insurer by oral contract at the application stage where the agent's representation differs from the words in the application. *See Ellingwood v. N.M. Investors Life Ins. Co.,* 111 N.M. 301, 306–07, 805 P.2d 70, 75–76 (1991). Nor do the circumstances here involve ambiguities existing as a result of differences between the application and the policy itself. *See Porter v. Butte Farmers Mut. Ins. Co.,* 68 N.M. 175, 185–86, 360 P.2d 372, 378–79 (1961) (Moise, J., dissenting).

{25} Upon its acquisition of the Lodge and continuation of the resort business engaged in the sale of liquor and provision of horseback riding to guests, the Tribe had the opportunity to familiarize itself with the existing policy's coverages and the endorsements containing exclusions. Running Elk had that same opportunity when it renewed the policy. Under these circumstances, it was unreasonable for the Tribe and Running Elk not to have examined the policies. Had they done so, they could not reasonably have missed the unmistakable exclusion set out in reasonably sized print. They must be held bound by the exclusion in a policy they failed to review. *See Porter,* 68 N.M. at 179, 360 P.2d at 375 (approving the view that an insured is chargeable with knowledge of terms of its policy where the terms are plain, clear, and free from all ambiguity).

{26} In sum, Running Elk's reasonable expectations argument falls short. We treat Simms's deposition testimony as indicating his subjective expectation of all-inclusive, blanket coverage. But it shows nothing more. His subjective expectation lacked reasonable basis. Under the circumstances here, a subjective expectation alone cannot create a genuine issue of material fact as to saddle animal liability coverage. The specific Saddle Animal Liability Exclusion was in the insured's possession from the very start of the Tribe's acquisition of the Lodge. The policy and exclusion language in this case are express and clear. The insured did not specifically request saddle animal liability coverage. Bundy made no statements to Simms that could lead Simms or Running Elk to expect saddle animal liability coverage. Further, neither Simms's silent reliance on Bundy to raise issues regarding the Lodge's insurance needs, nor Bundy's alleged failure to specifically alert Simms to the exclusion, gives rise to a genuine issue of material fact as to an objectively reasonable expectation of coverage.

## CONCLUSION

{27} The trial court properly granted summary judgment in favor of Western. There existed no genuine issue of material fact, and Western was entitled to judgment as a matter of law on the issue of coverage. We affirm.

{28} **IT IS SO ORDERED.**

WE CONCUR: CELIA FOY CASTILLO, Judge, and A. JOSEPH ALARID, Judge (specially concurring).

ALARID, Judge (specially concurring).

{29} I concur in the result reached by the majority opinion. I offer a few additional observations.

{30} Before a court can apply the doctrine of reasonable expectations to a corporation, it must identify the person or persons whose expectations about coverage are to be treated as the *insured's* expectations. I am concerned that the reader of the majority opinion may come away with the impression that this Court has independently concluded that Simms is the person whose expectations are controlling, when in fact, the Court has focused on Simms's expectations solely because Running Elk has emphasized Simms's state of mind in its effort to invoke the doctrine of

reasonable expectations. While Simms, as general manager of the Lodge, most certainly played a role in obtaining insurance coverage for the Lodge, there is no evidence that the Tribe or the management of Running Elk had delegated ultimate decision-making authority to Simms. The record before us presents a serious, unresolved question as to whether Simms's understanding of coverage constitutes Running Elk's understanding for purposes of the doctrine of reasonable expectations.

{31} There is, of course, a good reason why Running Elk has looked to Simms's state of mind and has attempted to gloss over Bundy's understanding of the transaction: Bundy testified that he knew prior to the accident that injured Nicholas Berlangieri that the Western renewal policy excluded saddle animal liability coverage. Bundy also testified that he had no contractual relationship with Floyd West and that when he obtained insurance through them, it was "strictly on a . . . come-as-you-are, negotiate-type deal" in which he was representing his clients in trying to get the most coverage for the lowest price he could find. The only supportable conclusion is that Bundy was the "producing broker" with respect to the Western policy. NMSA 1978, § 59A–14–2(C) (1991); *Barth*, 118 N.M. at 5, 878 P.2d at 323. Bundy, as producing broker, is presumed to have been Running Elk's agent. NMSA 1978, § 59A–18–24 (1984) ("[A]ny broker licensed to transact insurance business in this state, in any controversy between any insured or his beneficiary and the insurer issuing the insurance through its licensed agent at the request of the broker, shall be held to be the agent of the insured, . . . unless under particular circumstances it is found that the broker is representing the insurer."). Notwithstanding statements in *Barth* seemingly to the contrary, I do not believe that *Barth*

precludes a straightforward application of agency law in the present case. Therefore, because Bundy clearly acted as Running Elk's agent in procuring renewals of the Western policy, I would impute Bundy's knowledge of the saddle animal liability coverage exclusion to his principal, Running Elk,[3] Restatement (Second) of Agency §§ 272, 275 (1958), thereby negating any reasonable expectation of coverage for saddle animal liability. *Pope v. The Gap, Inc.*, 1998–NMCA–103, ¶ 13, 125 N.M. 376, 961 P.2d 1283 (quoting Restatement (Second) of Contracts § 20(1) (1981) (codifying principle that party seeking to enforce contract according to meaning attached by that party must show that it neither knows nor has reason to know of any different meaning attached by the other party)).

{32} The last point I wish to make concerns the trial court's decision to disregard Simms's affidavit. I do not understand the doctrine of reasonable expectations to be a departure from the general contract principle that a party is not bound by an interpretation of a contract of which he neither knew nor had reason to know. *Pope*, 1998–NMCA–103, ¶ 13, 125 N.M. 376, 961 P.2d 1283. *Barth* recognizes that evidence of the "dynamics of the insurance transaction" may be admitted to prove that the insurer knew or had reason to know of the insured's expectation of coverage. 118 N.M. at 5, 878 P.2d at 323. *Barth* did not hold that the "dynamics of the insurance transaction" extend to circumstances of which the insurer has no reason to know. Running Elk's attempt to invoke the doctrine of reasonable expectations foundered because Running Elk did not establish a genuine issue of fact that Western, or anyone whose knowledge is imputable to Western, had reason to know of Simm's undisclosed subjective belief that Running Elk had purchased saddle animal liability

---

3. The only evidence that conceivably could have allowed Bundy to be considered Western's agent was evidence that Bundy's commission was paid by Western out of the premium it collected. However, "almost all insurance brokers are actually compensated for their services through commissions that are paid by the insurers." Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 2.5, at 84 (Student ed.1988). The fact that NMSA 1978, § 59A–14–9(A) (1984) (permitting surplus line broker to compensate producing agent) and Section 59A–18–24 were both enacted as part of 1984 N.M. Laws ch. 127 strongly suggests that the Legislature was familiar with this usage of the insurance industry when it enacted Section 59A–18–24. Thus, the fact that Bundy received his commission out of the premium paid to Western cannot by itself provide a basis for disregarding the statutory presumption that Bundy was Running Elk's agent.

coverage. *Pope*, 1998–NMCA–103, ¶ 13, 125 N.M. 376, 961 P.2d 1283 (quoting Restatement (Second) of Contracts § 20(1) (1981) (codifying principle that party seeking to enforce contract according to meaning attached by that party must show that other party knew or had reason to know of that meaning)). Simms's "subjective but unexpressed intention" was therefore immaterial, *Pope*, 1998–NMCA–103, ¶ 14, 125 N.M. 376, 961 P.2d 1283, and the trial court did not err by disregarding Simms's affidavit.