879 P.2d 759

**Rachelle RODRIGUEZ, Plaintiff–Appellant,**

v.

**WINDSOR INSURANCE COMPANY, Defendant–Appellee.**

**No. 21116.**

Supreme Court of New Mexico.

July 19, 1994.

Rehearing Denied Aug. 15, 1994.

Montoya, Murphy & Garcia, Dennis P. Murphy, Santa Fe, for appellant.

Miller, Stratvert, Torgerson & Schlenker, Rudolph Lucero, Alice Tomlinson Lorenz, Albuquerque, for appellee.

*OPINION*

MONTGOMERY, Chief Justice.

This is another in the seemingly endless series of cases in New Mexico involving the principle of "stacking" uninsured motorist coverages under an automobile insurance policy covering more than one vehicle. Our past cases have evolved a strong judicial policy, rooted in this state's uninsured motorists insurance statute (NMSA 1978, Section 66–5–301 (Repl.Pamp.1994)), favoring stacking in order that a person injured by an uninsured or underinsured motorist may receive compensation for his or her damages to the extent of the insurance purchased for his or her protection. *See, e.g., Lopez v. Foundation Reserve Ins. Co.,* 98 N.M. 166, 170–71, 646 P.2d 1230, 1234–35 (1982).

Some insurance companies have attempted to circumvent this policy through a variety of measures, including antistacking clauses in their insurance policies and, more recently, premium structures for uninsured motorist benefits in multi-car policies that purport to avoid a separate charge for the coverage with respect to each car. This more recent effort lays heavy stress on the rationale in many of our cases predicating stacking, in significant part, on the insured's payment of multiple premiums for multiple coverages—i.e., a separate premium for the uninsured motorist coverage "on" each car insured under the policy. *See, e.g., id.* at 171, 646 P.2d at 1235. In one of our most recent stacking cases, *Allstate Insurance Co. v. Stone,* 116 N.M. 464, 863 P.2d 1085 (1993), we considered a multi-car policy in which the insurer charged a single premium for coverage with respect to all vehicles insured by the policy. We held that stacking of the coverages was permitted, but did not reach the effect of the single-premium charge. We relied instead on an internal inconsistency between the limitation-of-liability clause in the policy and a clause prohibiting combination of limits for certain types of coverage, expressly excluding uninsured motorist coverage—a repugnancy that rendered the policy's attempt to

prevent stacking ambiguous and, therefore, ineffectual. *Id.* at 466–67, 863 P.2d at 1087–88.

The question of the efficacy of a single premium to prevent stacking has returned in the present case. Once again, we find the policy ambiguous, in several respects, and hold that stacking must be permitted. The precise issue is whether, when the policy says that the premiums for uninsured motorist coverages with respect to additional vehicles under the policy are "included" in another premium (or other premiums), a reasonable insured might understand that more than one premium is charged, more than one coverage is purchased, and stacking of coverages is permitted. The lower court resolved this issue in favor of the insurer and entered summary judgment accordingly. We reverse and remand for further proceedings.

## I.

The case arises from an action, brought by Rachelle Rodriguez ("Rachelle") against the Windsor Insurance Company ("Windsor") and the Silas T. Garcia and Associates Agency ("the Garcia Agency"), for damages and a declaratory judgment that Rachelle was entitled to stack the uninsured motorist coverages under an automobile insurance policy purchased through the Garcia Agency and issued by Windsor.

Jacci Rodriguez, Rachelle's mother, purchased the policy; it provided various types of insurance on the three vehicles owned and used by her family. The drivers named in the policy were Jacci, her husband Reginald, and Rachelle.[1] The policy consisted of a declarations page, the underlying printed policy, an uninsured motorist endorsement, and other miscellaneous endorsements not material to the issue on appeal. Appearing prominently near the top of the declarations page was the statement, "INSURANCE IS PROVIDED WHERE A PREMIUM IS SHOWN FOR THE COVERAGE." Immediately below this statement was a grid or matrix of lines and columns showing the various types and amounts of coverage, with the premium charged for each, as follows:

| COVERAGE | LIMITS OF LIABILITY | PREMIUMS UNIT 1 | 2 | 3 |
|---|---|---|---|---|
| A BODILY INJURY | $50,000 EA PERSON | | | |
| | $100,000 EA ACCIDENT | 159.00 | 174.00 | 116.00 |
| B PROPERTY DAMAGE | $25,000 EA ACCIDENT | INCL | INCL | INCL |
| C MEDICAL PAYMENTS | $5,000 EA PERSON | | | |
| | $5,000 EA ACCIDENT | 30.00 | 30.00 | 30.00 |
| J UNINSURED MOTORIST | BI $50,000 EA PERSON | | | |
| | $100,000 EA ACCIDENT | 131.00 | INCL | INCL |
| | PD $25,000 EA ACCIDENT | INCL | INCL | INCL |
| D COMPREHENSIVE | $250 DEDUCTIBLE EA ACCIDENT | | 315.00 | |
| E COLLISION | $250 DEDUCTIBLE EA ACCIDENT | | INCL | |
| I TOWING AND LABOR | | | 3.00 | |
| | TOTAL BY UNIT | 320.00 | 522.00 | 146.00 |
| | TOTAL TERM PREMIUM | | | 988.00 |

Except for the term "INCL," this coverage/premium matrix is reasonably self-explanatory. The terms "BI" and "PD" mean, of course, bodily injury and property damage, respectively. The figures next to the word "UNIT" refer to vehicles identified on the declarations page—a 1961 Ford F–100 (Unit 1), a 1988 Ford Aerostar (Unit 2), and a 1974 Toyota Corona (Unit 3).

The language setting out the basic insuring agreement in the printed insurance policy closely followed the language on the declarations page; it provided: "We will insure you for the coverages and Limits of Liability for which a premium is shown in the Declarations of the policy." The uninsured motorist endorsement contained a "Limits of Liability" provision, stating:

**1.** Rachelle was a member of the Rodriguez household at the time of the accident and was a class one insured as contemplated by, *e.g., Konnick v. Farmers Insurance Co.,* 103 N.M. 112, 115–16, 703 P.2d 889, 892–93 (1985) (defining class one insureds as including "the named insured as stated in the policy, the spouse, and relatives residing in the household").

The company's limit of bodily injury liability for all damages, including damages for care and loss of services, arising out of bodily injury sustained by one person in any one accident shall not exceed the amount specified by the financial responsibility law of New Mexico for bodily injury to one person in any one accident.

Rachelle was injured in an automobile accident on May 27, 1990, while riding in a friend's car (not, it should be noted, in any of the three vehicles covered by the Windsor policy). Her injuries included a crushed skull and damage to her brain, neck, and back. She settled with the other party's liability insurance carrier for that carrier's policy limits of $25,000, an amount that was significantly less than her total damages. Asserting that she was covered by three underinsured motorist coverages under the Windsor policy,[2] she submitted a claim to Windsor requesting payment of the combined policy limits on the three coverages claimed (a total of $150,000). Windsor paid Rachelle the $50,000 bodily injury limit for one uninsured motorist coverage, minus an offset for the recovery obtained from the other party,[3] but denied the stacking request.

In May 1992, Rachelle commenced an action in district court against Windsor and the Garcia Agency, seeking a declaratory judgment that she was entitled to stack the three separate uninsured motorist coverages allegedly purchased for her benefit, along with a judgment for all sums due her under the policy and damages resulting from Windsor's denial of her stacking request. In due course, Windsor filed a motion for partial summary judgment on the stacking issue, and soon thereafter Rachelle filed her own motion for partial summary judgment on the same issue. After a hearing on both motions, the court denied Rachelle's motion and granted Windsor's. The parties stipulated that this decision effectively disposed of all claims against Windsor, and the court accordingly entered judgment in Windsor's favor on all claims. Rachelle appeals from that judgment and from the court's denial of her own motion for summary judgment.

## II.

In *Vigil v. California Casualty Insurance Co.*, 112 N.M. 67, 811 P.2d 565 (1991), we held that when an insurer charges separate premiums for medical payments coverages associated with each of the insured's vehicles and issues a policy containing an ambiguous limitation-of-liability clause, the coverages pertaining to each of the vehicles may be stacked. We reached this result by relying on four factors: the number of premiums charged, the reasonable expectations of the insured, the type of insurance coverage (i.e., whether it is associated with a particular automobile or is personal to or "follows" the insured), and the ambiguity of any limitation clause. Each of these considerations plays a role in the following analysis of the stacking issue on this appeal.

We have permitted stacking of uninsured motorist coverages when separate premiums have been paid "on the rationale that separate premiums for separate coverages entitle the insured to the benefit of what he or she has paid for." *Id.* at 71, 811 P.2d at 569; *see also Lopez*, 98 N.M. at 171, 646 P.2d at 1235 ("Where an insurance company charges a separate full uninsured motorist premium for each vehicle under a single or several policies, it is only fair that the insured be permitted to stack the coverages for which he has paid."). The parties here vigorously dispute

2. The uninsured motorist coverage under the policy included underinsured motorist coverage. We use the terms "uninsured motorist" and "underinsured motorist" interchangeably. *See Konnick*, 103 N.M. at 114 n. 1, 703 P.2d at 891 n. 1 ("underinsured motorist coverage is equivalent to uninsured motorist coverages for purposes of stacking benefits").

3. The order granting Windsor's motion for summary judgment stated that "the maximum uninsured/underinsured bodily injury benefit Plaintiff may claim is limited to $50,000 per person minus an offset of $16,666.67 for liability coverage previously received." However, Windsor's answer brief says that "[t]here was no dispute with respect to Plaintiff's entitlement to the difference between [the other party's] $25,000 limits and the $50,000 limit of the Windsor policy. That amount has been paid." We have referred simply to the "offset" without attempting to determine which figure is correct. That determination can be made, if necessary, by the trial court on remand.

whether more than one premium was charged to cover the family's three cars (or, more accurately, the class one insureds under the policy) with uninsured motorist benefits. Drawing on deposition statements of its product manager and on its internal rate manual to support its reading of the policy, Windsor contends that only one premium was charged (for the first car) and that no extra fee was assessed for coverage on the second and third cars. Rachelle argues, pointing to ambiguities in the declarations page and drawing inferences from recent changes in Windsor's premium structure,[4] that she was charged three separate premiums, or portions of premiums, for three separate coverages.

In some cases it is clear from the policy exactly how many premiums have been charged for a particular type of coverage; in others, such as this one, the number of premiums charged is not so clear. In such unclear cases, analyzing the number of premiums charged cannot be isolated from inquiring into the insured's reasonable expectations, see *Vigil*, 112 N.M. at 71, 811 P.2d at 569, because the essential factor in determining whether more than one premium has been charged is whether a reasonable insured reading the policy terms would think that she was paying more than one premium for more than one coverage. "Giving effect to the insured's reasonable expectations, in cases of policy ambiguity, is of course a well-settled approach to construing and applying language in insurance policies." *Federal Ins. Co. v. Century Fed. Sav. & Loan Ass'n*, 113 N.M. 162, 168, 824 P.2d 302, 308 (1992); *see also Western Commerce Bank v. Reliance Ins. Co.*, 105 N.M. 346, 348, 732 P.2d 873, 875 (1987) ("When there is ambiguity [in an insurance contract] . . ., the test is not what the insurer intended its words to mean, but

what a reasonable person in the insured's position would have understood them to mean.").

In *Vigil* we said:

A particular insured may or may not have expectations based on the premiums he or she has paid, and those expectations may or may not be reasonable in a particular case. In the *present* case, we hold that intra-policy stacking was available based on the wording of the policy and the kind of insurance at issue, as well as on what the trial court found were the reasonable expectations of the insured.

112 N.M. at 71, 811 P.2d at 569. Windsor cites this language for the proposition that "it was the particular expectations of the parties that mattered, *not* all the possible, hypothetical expectations that could arise from particular policy language." We disagree with this reading of *Vigil* and clarify that when we speak of the insured's reasonable expectations we refer to what the hypothetical reasonable insured would glean from the wording of the policy and the kind of insurance at issue, rather than how the particular insured who happens to buy the policy might understand it. Not many people who purchase automobile insurance comprehend esoteric legal and insurance concepts such as stacking. Consequently, Windsor's argument—that because Jacci Rodriguez was not familiar with the concept of stacking she could not have had a reasonable expectation that the coverages under the policy she purchased could be stacked—would apply to many insureds. This slippery slope sleights our policy of favoring the concept of stacking to ensure that the insured will receive the benefit of what he or she has paid for and that people concerned about the dangers of uninsured motorists will be compensated to the full extent of the insurance purchased for

---

4. Before 1989, Windsor sold uninsured motorist coverage, for a six-month period, with bodily injury limits of $50,000 per person and $100,000 per accident and a property damage limit of $25,000 per accident (the same as the limits in the Rodriguezes' policy), for $66 per single-vehicle policy and $120 per multi-car policy. In 1989, Windsor altered this premium structure by charging $131 for a six-month period, regardless of the number of cars covered by the policy. Based on Windsor's product manager's deposi-

tion statement that the purpose of the change was to prevent stacking, Rachelle claims that under the modified premium structure Windsor still charged multiple premiums for uninsured motorist coverage but concealed them by charging the higher premium of $131 for the first car (representing the averaged amount of the premiums that would have been charged to cover multiple cars) and gratuitously including coverage of the other cars.

their protection. *See Jimenez v. Foundation Reserve Ins. Co.,* 107 N.M. 322, 324, 757 P.2d 792, 794 (1988) ("The legislature intended that an injured person be compensated to the extent of insurance liability coverage purchased for his or her benefit."); *Schmick v. State Farm Mut. Auto. Ins. Co.,* 103 N.M. 216, 219, 704 P.2d 1092, 1095 (1985) ("[T]he intent of the Legislature was to put an injured insured in the same position he would have been in had the tortfeasor had liability coverage in an amount equal to the uninsured/underinsured motorist protection purchased for the insured's benefit.").

Coverage should not depend, as Windsor suggests, on how astute the particular insured is. Rather, the insurer who drafts the policy must "reasonably anticipate ... the effect of the language used upon an untrained mind, or ... how the language is understood by the ordinary person." 13 John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 7386, at 159 (1976) (footnote omitted). It is a well-recognized principle of insurance law that, since it is the insurer who normally drafts the documents memorializing the parties' agreement and the typical insured usually has very little input into the language of the contract, *see* Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 6.3(a)(1), at 628 (1988) (Practitioner's Ed.), the insurer has the responsibility of issuing an intelligible policy.[5] If the insurer issues

an ambiguous policy, the ambiguities are construed against the insurer.

Thus, in order to determine how many premiums the Rodriguezes paid for uninsured motorist coverage, we must first ascertain whether the terms of the policy, with respect to this issue, are ambiguous. If "the policy is ambiguous, judicial construction of its terms is required to give it effect," *Lopez,* 98 N.M. at 168, 646 P.2d at 1232, and we must examine whether its terms as viewed by a reasonable insured yield a reasonable impression that more than a single premium has been paid for more than a single uninsured motorist coverage.

We find Windsor's policy to be ambiguous with respect to its uninsured motorist coverages. Although the parties agree that the term "INCL" stands for "included," use of that term on the "uninsured motorist" line of the declarations page is susceptible to different interpretations.[6] To the untrained reader, it could signify, as Windsor argues, that although no premium was charged for uninsured motorist coverage on Units 2 and 3, coverage for those vehicles was included in the single $131 premium for the coverage on Unit 1. Or it could mean, as Rachelle asserts, that Windsor did charge premiums for the coverage on both Units 2 and 3, those premiums having been included in the premium for Unit 1, or in some other premium charged under the policy.[7]

5. The rationale behind this allocation of responsibility is forcefully expressed in *Sanchez v. Herrera,* 109 N.M. 155, 159, 783 P.2d 465, 469 (1989):

When a court examines the words of an insurance contract for ambiguity, a particular concern arises due to the nature of the contract. Modern contract theory emphasizes the importance of the bargain as an element of a typical contract. This model of a bargained-for enterprise carried out by, if not equally shrewd, at least free-willed parties, does not fit insurance contracts.... Not only does the insurance company draft the documents, but it does so with far more knowledge than the typical insured of the consequences of particular words. [Citations omitted.]

6. The significance of the term "INCL" on the declarations page is not explained in the uninsured motorist endorsement or in the definitions section of the policy, nor did the Garcia Agency ever clarify to the Rodriguezes what the term meant.

7. Another potential interpretation is that the "INCL"s placed in the columns under Units 2 and 3 on the uninsured motorist/bodily injury coverage line indicate that the premiums charged for coverage on those vehicles were included in the premium for another type of coverage (one appearing on a different line) or in the total premium charged for the entire policy. There is no reason why the "INCL"s in columns 2 and 3 on the uninsured motorist/bodily injury line are necessarily linked to the $131 premium shown in column 1 on that line. For example, the line for uninsured motorist/property damage coverage has "INCL" in all three columns, which means that the premiums charged for that coverage must have been included in the premium listed on another line or in the premium for the policy as whole. Similarly, "INCL" is inserted on the line for collision coverage only in column 2, which means that, although collision coverage indisputably was provided for Unit 2 and not for Units 1 or 3, the premium for the coverage had to be included in some other charge—probably the $315 premium for compre-

Although Windsor contends that the premium charged for uninsured motorist coverage did not vary with the number of cars insured, we note that there is a clause in the "Conditions" section of the uninsured motorist endorsement reading:

> **Premium.** If during the policy period the number of insured motor vehicles owned by the named insured or spouse ... changes, such insured shall notify the company during the policy period of any change and the premium shall be adjusted in accordance with the manuals in use by the company.

The typical insured perusing this language could reasonably draw the conclusion that the premium she paid for uninsured motorist coverage *did* vary with the number of vehicles insured. Moreover, because certain spaces in the "Premiums" columns on the declarations page were left blank where no premium was charged, it would be natural, or at least reasonable, for the typical insured (who presumably would not think she was receiving something for nothing) to assume she had paid consideration (a premium) for each space filled in with "INCL," especially since the declarations page said "INSURANCE IS PROVIDED WHERE A PREMIUM IS SHOWN FOR THE COVERAGE" immediately above the coverage/premium grid.[8]

■ Another source of ambiguity lies in fact that the uninsured motorist coverage is listed on the declarations page on a car-by-car basis. Uninsured motorist coverage follows the insured. *Vigil*, 112 N.M. at 70, 811 P.2d at 568. "Unless the policy explicitly provides otherwise, there is no particular relationship between the insurance benefits available to the insured and the automobile or other vehicle involved in the accident." *Id.; see also Lopez*, 98 N.M. at 170, 646 P.2d at 1234 ("[U]ninsured motorist coverage pro-

tects against bodily injury and does not relate to coverage of a particular vehicle.").[9] This point raises the question: If uninsured motorist coverage is personal to the named insureds and family members and is not linked in any way to whether they are riding in one of the cars listed on the policy, why does the uninsured motorist line indicate, by using "INCL," that there is coverage attached to each of the family's three cars? If Windsor is correct in its insistence that the policy only provides one uninsured motorist coverage regardless of the number of cars listed on the declarations page, then this format disingenuously leads the reader of the policy to believe that she is getting more than she paid for. "[I]f the language adopted by the insurer in its contract is capable of two constructions, it will not be permitted to adopt one construction in selling the policy and another in avoiding liability." Appleman, *supra*, § 7403, at 310.

The "Limits of Liability" provision in the endorsement is also ambiguous. It states that Windsor's liability for damages suffered by one person in one accident "shall not exceed the amount specified by the financial responsibility law of New Mexico for bodily injury to one person in any one accident." However, those limits (set in NMSA 1978, Section 66–5–208 (Repl.Pamp.1994), at $25,000 per person and $50,000 per accident), contradict the limits listed on the Rodriguezes' declarations page: $50,000 per person and $100,000 per accident. This contradiction renders the clause fatally inconsistent, and Windsor acknowledges that the clause must be disregarded.

At this point it is clear that the documents the Rodriguezes received from Windsor contained a number of ambiguities in setting out Windsor's uninsured motorist premium structure and that there are reasonable interpretations of the documents that could

---

hensive coverage shown on the line immediately above it.

**8.** The New Mexico Insurance Code defines "premium" as follows: " '[P]remium' means the consideration for insurance or for an annuity, *by whatever name called.*" NMSA 1978, § 59A–18–3 (Repl.Pamp.1992) (emphasis added).

**9.** In *Vigil*, we quoted this pithy line from one of our past cases: " 'The uninsured motorists protection covers the insured and the family members while riding in uninsured vehicles, while riding in commercial vehicles, while pedestrians or while rocking on the front porch.' " 112 N.M. at 70, 811 P.2d at 568 (quoting *Chavez v. State Farm Mut. Auto. Ins. Co.*, 87 N.M. 327, 330, 533 P.2d 100, 103 (1975)).

lead the typical, untrained insured to believe that she could stack uninsured motorist benefits. In light of the principles of construction that apply to judicial interpretation of insurance contracts, we hold that the three separate coverages indicated on the uninsured motorist/bodily injury line of the declarations page may be stacked and that Rachelle's motion for partial summary judgment on this issue should have been granted.

## III.

We do not declare that it is impossible for an insurance company to issue uninsured motorist coverage that is immune to stacking. We wish to emphasize, however, that because the insurer conceptualizes and drafts the contract, it has an obligation to express clearly its intent not to allow stacking—to its agents who sell the policy and, more importantly, to the insureds to whom it issues the agreements it prepares. "[T]he insurer has a duty to make any [limitations of or] exclusions from coverage both clear and conspicuous. Any limitations should be so written that the insured, by reading the policy, can understand what the exclusions are, when they are given a reasonable and fair interpretation." Appleman, *supra*, § 7403, at 318–20 (footnotes omitted). If the policy documentation is unclear, the insured will not be able to make an informed decision whether to purchase and stay with that policy (and that insurance company) or to opt for another.

In *Vigil*, we noted the similarity between uninsured motorists coverage and medical payments coverage because both kinds of insurance provide personal accident coverage, which "follows" the insured, rather than insurance that is attached to or associated with a particular vehicle (as, for example, liability, collision, and comprehensive coverages are). In *Sanchez*, 109 N.M. at 160, 783

P.2d at 470, we gave effect to an unambiguous clause providing that medical payments coverages could not be stacked. Despite the strength of the judicial policy mentioned at the beginning of this opinion and as discussed in, *e.g., Jimenez*, 107 N.M. at 324–26, 757 P.2d at 794–96, it may be possible to give effect to a *truly* unambiguous antistacking clause, provided it plainly notifies the insured that only one premium has been charged for one insurance coverage, that the coverage provides personal accident insurance that cannot be stacked regardless of the number of vehicles covered by the policy, and that the insured should bear this feature in mind when purchasing insurance. *See Kinder v. Oklahoma Farmers Union Mut. Ins. Co.*, 813 P.2d 546, 548 (Okla.Ct.App.), *cert. denied*, 813 P.2d 546 (1991) (stating that insurance company could limit uninsured motorist benefits under multi-car policy provided it adequately informed insured that only one premium was charged regardless of number of vehicles covered and that insured should so understand in selecting uninsured motorist limits).[10] That question, however, is not before us. There will be time enough to consider the question when it is properly presented, briefed, and argued.

The summary judgment in Windsor's favor is reversed, and the cause is remanded to the district court for further proceedings consistent with this opinion.

IT IS SO ORDERED.

BACA and FRANCHINI, JJ., concur.

---

10. In *Scott v. Cimarron Insurance Co.*, 774 P.2d 456, 456–57 (Okla.1989), the Oklahoma Supreme Court held that the insured could not stack coverages when the insurance company included the following language in the form where the insured chose which coverages he wanted included in the policy:

The Oklahoma Supreme Court has held in some cases that Uninsured Motorists protection could be stacked, unlike liability coverages. This means in some instances the Unin-

sured Motorists limits could be multiplied by the number of vehicles that had premiums charged for that coverage. The Cimarron and Plains Insurance Companies charge only one premium for this coverage per policy regardless of the number of vehicles insured. The insurance companies intend that there be only one, single, Uninsured Motorists limit entitlement. You should keep this important information in mind when selecting the limits for this coverage. [Emphasis omitted.]