2003 UT 48

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff and Appellee,**

v.

**Lora GREEN and Marlene Murray, Defendants and Appellant.**

No. 20010316.

Supreme Court of Utah.

Nov. 4, 2003.

Rehearing Denied Dec. 31, 2003.

Richard K. Glauser, Albert W. Gray, Salt Lake City, for plaintiff.

L. Rich Humpherys, Charles M. Lyons, Salt Lake City, for defendants.

PARRISH, Justice:

¶ 1 In this case, we consider whether Lora Green, who was severely injured in an automobile accident, is entitled to underinsured motorist ("UIM") coverage despite having settled with a tortfeasor, Marlene Murray, in apparent violation of the terms of her auto insurance policies. At the time of the accident, Green held two auto insurance policies containing UIM coverage that were underwritten by State Farm Mutual Automobile Insurance Company ("State Farm"). After Green settled with Murray, State Farm brought an action seeking a declaration that State Farm was not obligated to pay Green under her UIM coverage.

¶ 2 The district court granted summary judgment to State Farm after finding there could be no genuine factual dispute that Green had violated the terms of her policies requiring her to obtain State Farm's consent before settling with Murray. We uphold the district court's finding on this question. However, we hold that State Farm may not deny UIM coverage to Green on the basis of her breach unless State Farm was actually prejudiced by Green's settlement with Murray. We therefore reverse and remand for a determination of whether State Farm was prejudiced by the settlement. We also hold that if State Farm was not prejudiced by the settlement, Green is entitled to recover up to the applicable limits under both of her policies.

## STANDARD OF REVIEW

¶ 3 Because this is an appeal from the district court's grant of summary judgment to State Farm, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to Green, and we give no deference to the trial court's decision. *See Arnold Indus. v. Love*, 2002 UT 133, ¶ 11, 63 P.3d 721. We will affirm summary judgment if "there is no genuine issue as to any material fact" so that "the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(c).

## FACTUAL BACKGROUND

¶ 4 Marlene Murray, a retired school cafeteria worker, is Lora Green's mother. Green was a passenger in a 1987 Dodge pickup truck driven by Murray along a two-lane highway through Provo Canyon in July of 1995. Murray drove her truck into the oncoming lane of traffic, mistakenly believing the lane was meant for traffic moving in her direction. Murray's truck then collided with a truck traveling in the opposite direction, which was driven by Lloyd Louder and was towing a boat.

¶ 5 Green was severely injured in the accident. She lost partial use of her arm, and the necessary treatments for her extensive injuries included skin grafts. The accident and Green's injuries are further described in this court's opinion in *Green v. Louder*, 2001 UT 62, ¶¶ 2–4, 29 P.3d 638.

¶ 6 Green sued Louder, but a jury found that Louder was not liable for Green's injuries in the accident. *Id.* at ¶ 11. Thus, Green's primary source of insurance recovery for her injuries was the liability coverage held by Murray. *See* Utah Code Ann. § 31A–22–305(9)(b) (1995) ("The named in-

sured's underinsured motorist coverage ... is secondary to the liability coverage of an owner or operator of an underinsured motor vehicle."). Murray's liability insurance was underwritten by Horace Mann Insurance Company ("Horace Mann") and contained a liability limit of just $25,000, a sum that was insufficient to compensate Green for her substantial injuries.

¶ 7 Green's attorney, Jackson Howard, negotiated a settlement with Murray and Horace Mann for Murray's $25,000 policy limit. Howard knew that Green might be able to recover further under the UIM coverage contained in her State Farm policies. However, a provision in those policies required Green to obtain State Farm's consent prior to any settlement with Murray in order to preserve her UIM claim. That provision stated there would be no underinsured motorist coverage

> FOR ANY INSURED WHO, WITHOUT OUR WRITTEN CONSENT, SETTLES WITH ANY PERSON OR ORGANIZATION WHO MAY BE LIABLE FOR THE BODILY INJURY AND THEREBY IMPAIRS THE RIGHT TO RECOVER OUR PAYMENTS.

We will refer to this provision as the "consent to settle exclusion."

¶ 8 Howard orally notified State Farm that Green wished to settle with Murray for her $25,000 policy limit, but Howard did not submit a written request to State Farm for permission to settle, nor did he provide State Farm with a written copy of the terms of the proposed settlement. In a letter dated November 6, 1995, Bonnie Markham, a claim specialist with State Farm, informed Howard's office that State Farm required "verification" of the Horace Mann $25,000 policy limit along with Horace Mann's offer to extend the limit and that State Farm needed to "conduct an assets check on Marlene Murray" before it would "authorize Ms. Green to sign any releases."

¶ 9 Almost three months later, Howard had not provided the information requested by State Farm and State Farm had neither conducted the asset check on Murray nor given written consent to the settlement. Nevertheless, on February 16, 1996, Green, anxious to receive the $25,000 offered by Horace Mann to satisfy some of her mounting medical bills, entered into the settlement with Murray, releasing Murray from all claims arising out of the accident. After the settlement, State Farm brought this action in district court, arguing that Green's breach of the consent to settle exclusion relieved State Farm of any obligation to pay Green's UIM claim.

¶ 10 At the trial court, both parties moved for summary judgment. Following discovery, the trial court entered summary judgment in favor of State Farm. The trial court held that the consent to settle exclusion was valid, that Green had violated the terms of the consent to settle exclusion, and that Green's breach relieved State Farm of any liability to pay UIM benefits. Green appealed.

¶ 11 On appeal, Green argues that the trial court erred in upholding the validity of the consent to settle exclusion. Green further argues that, even if the exclusion is enforceable, the trial court nevertheless erred because there were factual disputes precluding summary judgment and because Green's settlement with Murray did not actually impair State Farm's right to recover against Murray.

## DISCUSSION

### I. THE CONSENT TO SETTLE EXCLUSION

¶ 12 We first address Green's argument that the trial court erred in holding that State Farm was entitled to summary judgment due to Green's breach of the consent to settle exclusion. Consideration of this argument requires a three-part analysis. First, we consider whether consent to settle exclusions like the one contained in Green's policies with State Farm are valid under Utah law. If such provisions are valid, we then consider whether Green breached the terms of the exclusion. If so, we finally address whether Green's breach was a material breach that relieves State Farm of any obligation to pay Green's UIM claim.

### A. Is the Consent to Settle Exclusion Enforceable?

¶ 13 Green argues that the consent to settle exclusion is unenforceable because it violates Utah public policy and is inconsistent with Utah's statutory scheme for UIM coverage. State Farm argues that such provisions are, in fact, consistent with public policy and are therefore valid.

¶ 14 Consent to settle exclusions like the one in Green's policies are intended to protect an insurer's subrogation rights against a tortfeasor. When an insurer pays a claim for which a tortfeasor is liable, the insurer may step into the shoes of the victim and proceed against the tortfeasor for recovery of the payment it made to the victim. *See* Utah Code Ann. § 31A–21–108 (2001); *State Farm Mut. Auto. Ins. Co. v. Northwestern Nat'l Ins. Co.*, 912 P.2d 983, 985 (Utah 1996). Because a subrogation claim is derived from an injured party's claim against a tortfeasor, any agreement between the injured party and the tortfeasor that releases the tortfeasor from liability may also foreclose the insurer's subrogation rights.[1] *See Hill v. State Farm Mut. Auto. Ins. Co.*, 765 P.2d 864, 867 (Utah 1988) (holding that an insurer's subrogation right was extinguished by the insured's settlement with a tortfeasor). A consent to settle exclusion in the UIM context is designed to prevent a victim and a solvent tortfeasor from shifting the tortfeasor's obligation to pay the victim's damages to the victim's UIM provider.

¶ 15 Green argues that the consent to settle exclusion is unenforceable under Utah law because it is inconsistent with Utah's statutory scheme of mandatory UIM coverage. *See* Utah Code Ann. § 31A–22–302(1) (1995).[2] By vesting the insurer with the ability to deny approval of proposed settlements, Green asserts that consent to settle

exclusions give the insurer, rather than the victim, control of litigation between the tortfeasor and the victim. According to Green, this frustrates the statute's goal of making recovery available for victims of underinsured motorists because it allows the insurer to withhold consent to settle, thereby eliminating the insurer's obligation to pay UIM claims or forcing a victim to continue litigating even when the victim's interests would best be served by accepting a proposed settlement.

¶ 16 We conclude that the consent to settle exclusion is enforceable. At the outset, we note that consumers may opt out of the otherwise required UIM coverage pursuant to sections 31A–22–302(1)(c) and 31A–22–305(9)(c) of the Utah Code.[3] Where the statutory scheme allows consumers the option of refusing coverage altogether, it is difficult to see how a policy exclusion that simply attaches conditions to coverage could be unenforceable as against public policy.

¶ 17 Our conclusion that the consent to settle exclusion is valid is consistent with our holding in the similar context of uninsured motorist ("UM") coverage. In *Clark v. State Farm Mutual Automobile Insurance Co.*, 743 P.2d 1227, 1228 (Utah 1987), we held that an exclusion to UM coverage did not violate public policy. In so holding, we relied on the fact that consumers could opt out of UM coverage and on the statutory language that did not evidence an intent to require insurers to offer UM coverage without conditions or exclusions. These reasons apply with equal force to the UIM statutory scheme.

¶ 18 While Green's concerns about an insurer exercising control over litigation to the detriment of its insureds are legitimate, the insurer also has a legitimate interest in preventing collusive settlements that would fore-

---

1. While the trial court found that Green's settlement with Murray terminated Murray's "liability and potential liability" to State Farm, a settlement and release does not always foreclose subrogation rights. "[A] settlement between an injured party and a tortfeasor who has [actual or constructive] knowledge of the subrogation rights of the injured party's insurer does not destroy the subrogation claim of the injured party's insurer." *Educators Mut. Ins. Ass'n v. Allied Prop. & Cas. Ins. Co.*, 890 P.2d 1029, 1031 (Utah 1995) (citing

*Transamerica Ins. Co. v. Barnes*, 29 Utah 2d 101, 505 P.2d 783, 787 (1972)).

2. We consider the underinsured motorist statutes as they existed in 1995, when Green's accident occurred, unless otherwise indicated.

3. The UIM waiver provision is currently found at Utah Code Ann. section 31A–22–305(9)(b).

close its right to recover from a solvent tortfeasor through subrogation. Absent a consent to settle exclusion, a victim and a tortfeasor might collude in an attempt to shield the tortfeasor from paying the victim's damages, and the victim would instead attempt to recover exclusively from his or her insurer. Insurance consumers also have an interest in preventing such collusion. By preventing some instances of insurance fraud, the widespread use of consent to settle exclusions should, in theory, reduce premiums.

■ ¶ 19 We also find it relevant that an insurer is subject to a duty to act in good faith. *See Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985). Such a duty requires that the insurer respond promptly and reasonably to an insured's request for consent to a proposed settlement. In other words, consent to settle exclusions may not be interpreted so as to grant an insurer unfettered discretion over whether its insured will be covered, nor may they be interpreted to cede to the insurer complete control over a victim's claim against an underinsured tortfeasor. Indeed, recent legislation requires that an insurer respond within five business days to notification that "all liability insurers have tendered their liability policy limits" by paying an amount equal to the tendered policy limits or forfeit its subrogation rights. Utah Code Ann. § 31A–22–305(12) (2001).[4]

¶ 20 In summary, we conclude that public policy interests do not weigh so heavily against the consent to settle exclusion that we should hold such clauses generally unenforceable. Such exclusions operate to protect an insurer's interest in subrogated recovery and, with it, the public's interest in lower premiums. Moreover, both the statutory scheme and the insurer's common law duties provide some protection to the consumer from an insurer who seeks to control its insured's claims against a tortfeasor to the detriment of its insured. Accordingly, we decline to adopt a rule invalidating consent to settle exclusions.

### B. Did Green Breach the Terms of the Consent to Settle Exclusion in this Case?

¶ 21 Green argues that the district court erred in finding that she breached the terms of the consent to settle exclusion contained in her State Farm policies. First, Green asserts that the consent to settle exclusion does not apply to this case because State Farm's subrogation right had not matured at the time of Green's settlement with Murray. Second, Green argues that genuine issues of material fact existed as to whether she breached the terms of the consent to settle exclusion in this case so as to make summary judgment improper. Specifically, Green argues that State Farm was presented with a meaningful opportunity to consent to the settlement and failed to respond. We address each argument in turn.

### 1. Was State Farm's Right to Subrogation Mature?

■ ¶ 22 Green argues that the language of her State Farm policies permits her to recover UIM benefits despite her breach of the consent to settle exclusion because State Farm's subrogation rights were not mature at the time of her settlement with Murray. The exclusion bars coverage for any insured who, without State Farm's consent, settles with a tortfeasor "and thereby impairs [State Farm's] right to recover [its] payments." Green asserts that because State Farm had not paid any UIM benefits to Green by the time of her settlement with Murray, State Farm had no vested right to recover its payments and thus there could be no impairment of that right. Green further argues that the provision is at the very least ambiguous and that we should construe ambiguous provisions in insurance policies against the insurer pursuant to *L.D.S. Hospital v. Capitol Life Insurance Co.*, 765 P.2d 857, 858 (Utah 1988).

---

4. Because this particular statute was not adopted until well after Green's accident, the requirements it imposes are not applicable in this case. Nevertheless, it is relevant to our analysis inasmuch as it weighs against Green's argument that consent to settle exclusions frustrate the UIM statutory scheme and the public policy interests underlying it.

¶ 23 We acknowledge that an insured is entitled to the broadest protection reasonably understood to be provided by the policy. *Fuller v. Dir. of Fin.*, 694 P.2d 1045, 1047 (Utah 1985). Nevertheless, we do not think a reasonable person would read the consent to settle exclusion in the manner urged by Green. Green's interpretation of the policy language suggests that a right that has not yet matured cannot be impaired. We disagree. A right that can be exercised only upon the occurrence of certain conditions is not without value. Moreover, that value can be extinguished by impairing the ability to exercise the right upon the occurrence of those conditions.

¶ 24 We are also persuaded that the interpretation Green urges is incorrect because it would render the consent to settle exclusion meaningless. The purpose of the exclusion is to prevent a victim and a solvent tortfeasor from entering into a non-arm's-length settlement that releases the tortfeasor from all liability, thereby shifting the obligation to pay the victim's damages to the UIM carrier. Were we to accept Green's suggested interpretation, insureds and tortfeasors would be able to enter into collusive settlements with impunity so long as they did so before the insurance carrier had paid UIM benefits. We decline Green's invitation to interpret the policy in this manner.

2. Was State Farm Presented with a Meaningful Opportunity to Approve the Settlement?

¶ 25 Green argues that the trial court erred in entering summary judgment because State Farm had a meaningful opportunity to approve the settlement and unreasonably refused to do so. Green asserts that her attorney orally notified State Farm that Murray's insurer had offered the $25,000 policy limit and that Green desired to accept that offer. State Farm responded with a letter requesting verification of the offer and indicating that it needed to conduct a check of Murray's assets. Several months then elapsed before Green actually consummated the settlement. Green contends that this was ample time for State Farm to conduct an asset check and authorize the settlement.

She argues that State Farm's delay in conducting the asset check should preclude State Farm from using its need for the information as a reasonable basis for withholding consent to the settlement.

¶ 26 We hold that it was reasonable for State Farm to expect that Green's attorney would respond to State Farm's request for written verification of Murray's policy limits and proposed settlement offer. Because Green's attorney never responded to State Farm's request, the trial court correctly held that there could be no factual basis for concluding that State Farm was presented with a meaningful opportunity to consent. We therefore uphold the trial court's conclusion that Green breached the terms of the consent to settle exclusion when she entered into the settlement with Murray.

*C. Was Green's Breach of the Consent to Settle Exclusion Material?*

¶ 27 Having held the consent to settle exclusion enforceable and having concluded that Green breached the exclusion, we now address whether the breach was a material breach relieving State Farm of its obligation to pay benefits under the UIM policy or an immaterial breach that does not void coverage.

¶ 28 Before we may determine whether Green's breach of the exclusion was material, we must ascertain the standard to be used in determining materiality. Under the view espoused by State Farm, Green's breach would be deemed material so long as it impaired State Farm's *theoretical* right to recover from Murray. Green's breach would then be material regardless of the extent of Green's injuries, Murray's assets, or the strength of Green's tort claim against Murray.

¶ 29 According to the argument espoused by Green, her breach would be material only if State Farm can prove that the settlement *actually* prejudiced its ability to recover from Murray through subrogation. In other words, if State Farm could not have recovered from Murray in any event, then Green's breach of the consent to settle exclusion did not prejudice State Farm and should not result in the forfeiture of insurance coverage.

**104**

¶ 30 The actual prejudice requirement urged by Green has been widely adopted by state courts confronted with facts similar to those presented here. *See* 3 Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 43.5, at 512 (2d ed. 1998) ("There is now a significant body of judicial precedents for the proposition that in order to justify foreclosing an insured's right to indemnification from an otherwise applicable underinsured motorist insurance coverage, an insurer must show that it was prejudiced by the settlement of the tort claim."); *see also Shelter Mut. Ins. Co. v. Bough,* 310 Ark. 21, 834 S.W.2d 637, 640 (1992); *Sutch v. State Farm Mut. Auto. Ins. Co.,* 672 A.2d 17, 21–22 (Del.1995); *Southeastern Fid. Ins. Co. v. Earnest,* 395 So.2d 230, 230–31 (Fla.Dist. Ct.App.1981); *Taylor v. Gov't Employees Ins. Co.,* 90 Hawai'i 302, 978 P.2d 740, 749 (1999); *Bantz v. Bongard,* 124 Idaho 780, 864 P.2d 618, 623–24 (1993); *Kapadia v. Preferred Risk Mut. Ins. Co.,* 418 N.W.2d 848, 852 (Iowa 1988); *Greenvall v. Maine Mut. Fire Ins. Co.,* 715 A.2d 949, 954 (Me.1998); *MacInnis v. Aetna Life & Cas. Co.,* 403 Mass. 220, 526 N.E.2d 1255, 1258–59 (1988); *Am. Family Mut. Ins. Co. v. Baumann,* 459 N.W.2d 923, 926–27 (Minn.1990); *Tegtmeyer v. Snellen,* 791 S.W.2d 737, 740 (Mo.Ct.App. 1990); *Sorensen v. Farmers Ins. Exch.,* 279 Mont. 291, 927 P.2d 1002, 1005 (1996); *Silvers v. Horace Mann Ins. Co.,* 324 N.C. 289, 378 S.E.2d 21, 26–28 (1989); *Ferrando v. Auto–Owners Mut. Ins. Co.,* 98 Ohio St.3d 186, 781 N.E.2d 927, 946–47 (2002); *Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691, 693 (Tex.1994); *Thiringer v. Am. Motors Ins. Co.,* 91 Wash.2d 215, 588 P.2d 191, 193 (1978); *Kronjaeger v. Buckeye Union Ins. Co.,* 200 W.Va. 570, 490 S.E.2d 657, 674 (1997); *Ranes v. Am. Family Mut. Ins. Co.,* 219 Wis.2d 49, 580 N.W.2d 197, 203 (1998).

¶ 31 We agree with Green and join those courts holding that the breach of a consent to settle exclusion is material only if it results in actual, rather than theoretical, impairment of an insurer's ability to recover through subrogation. The purpose of UIM coverage is to provide a source of indemnification for accident victims when the tortfeasor does not have adequate coverage. Denying coverage to an accident victim on the basis of a merely technical breach that has no effect on the insurer's ability to recover through subrogation does not further that purpose.

¶ 32 The actual prejudice requirement that we adopt is consistent with the legislative scheme. Utah law prevents an insurance company from relying on certain technical policy breaches as a basis for denying coverage. Generally, if an insured in Utah fails to provide notice or proof of loss to its insurer as required by the terms of an insurance policy, the insurer may not deny recovery to the insured unless the insurer was prejudiced by the failure. Utah Code Ann. § 31A–21–312(2) (2001). There is no reason why the rule should be harsher to the insured in the context of a settlement that could affect an insurer's subrogation rights. The actual prejudice rule strikes an appropriate balance between protecting an insurer's interests and avoiding forfeiture of coverage when an insurer has not been harmed.

¶ 33 In order to show actual prejudice, it is not sufficient for an insurer to show that its right of subrogation has been extinguished. Rather, the insurer may deny coverage only if it would have had a realistic possibility of recovering from the tortfeasor had its subrogation right not been foreclosed by the insured's settlement with the tortfeasor. This requires an assessment of factors such as the assets held by the tortfeasor, the strength of the insurer's subrogation claim (i.e., the strength of the underlying tort claim), the expenses and risks of litigating the insured's cause of action, and the extent of the victim's damage.

¶ 34 The extent of the victim's damage is relevant because an insurer cannot assert its equitable subrogation rights against a tortfeasor unless its insured has been made whole. *Hill v. State Farm Mut. Auto. Ins. Co.,* 765 P.2d 864, 866 (Utah 1988). In this case, State Farm argues that allowing it to subrogate against Murray has nothing to do with Green's being made whole because the "made whole" doctrine is an equitable principle applied in cases involving equitable subrogation and State Farm's claim against

Murray is one of contractual subrogation arising under the terms of its policies. While the doctrine of equitable subrogation generally can be modified by contract, we previously have held that "in the absence of express [contractual] terms to the contrary, the insured must be made whole before the insurer is entitled to be reimbursed from a recovery from the third-party tort-feasor." *Id.*

¶ 35 We find the language of Green's policies with State Farm insufficiently clear to remove this case from the general rule that the victim must be made whole before the insurer can recover from the tortfeasor. Green's policies do contain general language stating that State Farm is entitled to recover "to the extent of [its] payments, [from] the proceeds of any settlement the insured recovers from any party liable for the bodily injury." This general language, however, is insufficient to explicitly inform policyholders that State Farm is entitled to recover its UIM payments from the personal assets of a liable party even though the assets of the liable party are insufficient to fully compensate the injured victim.

■ ¶ 36 If an insurer seeks to assert priority over an uncompensated victim in recovering its UIM payments from the assets of a tortfeasor, the policy provisions must clearly and unambiguously put the policyholder on notice of that fact.[5] *Hill,* 765 P.2d at 866. We hold that State Farm's policies with Green do not contain express contractual terms sufficient to alter the general rule that an insurer cannot assert its subrogation rights against a tortfeasor unless its insured has been made whole. Accordingly, in order to determine whether State Farm was prejudiced by Green's settlement with Murray, it will be necessary to consider whether Murray had assets sufficient to fully compensate Green for her damages.

■ ¶ 37 Because the trial court granted summary judgment to State Farm based on theoretical, rather than actual, prejudice, the record is insufficient for us to determine whether there were undisputed material facts establishing that State Farm was actually prejudiced by Green's failure to obtain its consent to her settlement with Murray. For this reason, we remand the case to the trial court for further proceedings consistent with this opinion. On remand, the trier of fact should evaluate the strength of Green's claim against Murray, the costs and risks of litigation, and the issue of whether Murray would have had sufficient reachable assets to reimburse State Farm for a meaningful portion of its UIM payments after fully compensating Green for her injuries. If not, State Farm was not prejudiced by Green's settlement with Murray and Green is entitled to recover UIM benefits from State Farm.

## II. STACKING

■ ¶ 38 At the time of her accident, Green carried two separate State Farm policies, each providing $100,000 of UIM coverage. If State Farm was not prejudiced by Green's settlement with Murray, the question arises whether Green is entitled to recover up to the limits under both of her policies or under just one.

¶ 39 The general question of recovery under more than one insurance policy or coverage is treated in case law and commentary under the rubric of "stacking." To recover under more than one policy (or more than one coverage within a policy) for a single accident is to "stack" policy limits. Recovery for a single incident of loss up to the limits of coverage under more than one insurance policy is "interpolicy stacking." Recovery for a single incident of loss up to the limits of more than one coverage within a single policy (e.g., separate coverage limits for multiple vehicles under a single auto insurance policy) is "intrapolicy stacking." Provisions in insurance policies attempting to forbid stacking are often referred to as "anti-stacking" provisions.

¶ 40 An anti-stacking provision effectively renders every overlapping policy after the first one (or the one with the highest limits) purchased by a consumer worth less than the

---

5. We express no opinion as to whether such a provision would withstand judicial scrutiny or be found unenforceable based on the argument that it is inconsistent with the underlying purpose of Utah's statutory scheme for UIM coverage.

first. To illustrate, consider a pedestrian who is struck and injured by an underinsured motorist. The pedestrian owns two auto insurance policies, each of which covers the victim if she is injured as a pedestrian by an underinsured motorist, and each of which purports to provide the same dollar amount of underinsured motorist coverage, except for anti-stacking clauses found in both policies. The anti-stacking clauses permit recovery under only one of the policies. In fairness, the premium paid for the second of the policies should be discounted to reflect the fact that the insured is permitted to recover only under the first policy. Otherwise, the insurer is using the anti-stacking provisions in the policies to avoid providing coverage for which the consumer is paying.

¶ 41 In considering whether and under what circumstances to enforce anti-stacking provisions in insurance policies, many courts and commentators have considered the premium payments made by the insured. *See, e.g., Kent v. Middlesex Mut. Assurance Co.,* 226 Conn. 427, 627 A.2d 1319, 1322 (1993) ("[W]e have found stacking to be available when the insured has paid separate premiums for the underinsured motorist coverage afforded to each vehicle."); *Yeager v. Auto-Owners Ins. Co.,* 335 N.W.2d 733, 736–37 (Minn.1983) (finding premium structure relevant in permitting an insured to stack UIM coverages); *Patterson v. Nationwide Mut. Ins. Co.,* 1993 WL 405846, *8, 1993 U.S. Dist. LEXIS 14055, at *28 (E.D.Pa.1993) (applying Pennsylvania law) ("The payment of separate premiums is of paramount importance in the stacking context."); *West Bend Mut. Ins. Co. v. Playman,* 171 Wis.2d 37, 489 N.W.2d 915, 916–17 (1992) (permitting "an insured who pays separate premiums for each vehicle under a single insurance policy" to stack coverages).

¶ 42 In general, purchasers of insurance ought not to be denied coverage for which they have paid premiums. *See, e.g., U.S. Fid. & Guar. Co. v. Sandt,* 854 P.2d 519, 525 (Utah 1993) (holding that an interpretation of an insurance policy under which the insurer would "never have to pay the full amount of the purchased coverage" would be "uncon-

scionable"). In fact, some courts have taken the view that an insurer's use of an anti-stacking clause without an appropriate premium discount is unconscionable. *See, e.g., Abramson v. Aetna Cas. & Sur. Co.,* 76 F.3d 304, 305 (9th Cir.1996) ("Applying Hawaii law, it is clear that anti-stacking provisions in personal automobile insurance policies are not permitted to defeat fair compensation for persons injured by underinsured motorists. . . ."); *Rodriguez v. Windsor Ins. Co.,* 118 N.M. 127, 879 P.2d 759 (1994) (expressing "a strong judicial policy . . . favoring stacking" so that victims of uninsured or underinsured motorists receive the level of compensation for which they have paid); *see also Nielsen v. O'Reilly,* 848 P.2d 664, 672 (Utah 1992) (Stewart, J., dissenting) ("It would be unconscionable to permit an insurance company offering statutorily required coverage to collect premiums for it with one hand and allow it to take the coverage away with the other by using a self-devised 'other insurance' limitation." (citation and quotation omitted)).

¶ 43 Despite the fact that prohibitions against stacking render certain coverages meaningless, there are many anti-stacking provisions in insurance policies, as well as state statutes that forbid stacking, without regard to how much an insured has paid for insurance protection. Accordingly, we now analyze Green's particular policies in light of the Utah statutory scheme to determine whether Green is entitled to stack the UIM coverages contained in her two State Farm policies.

¶ 44 Each of Green's policies contains an anti-stacking provision. However, the Utah legislature has enacted a comprehensive statutory scheme governing stacking in the context of UIM coverage. *See* Utah Code Ann. § 31A–22–305(10) (1995). Because the statute defines the circumstances under which stacking is available, the anti-stacking provisions in Green's policies have been preempted. Therefore, the question of whether Green is allowed to stack her coverage presents a matter of statutory, rather than contract, interpretation.[6] A matter of

---

6. In *Nielsen v. O'Reilly,* 848 P.2d 664 (Utah 1992), and *Martin v. Christensen,* 22 Utah 2d

statutory interpretation is a question of law that we review on appeal for correctness. *State v. Schofield*, 2002 UT 132, ¶ 6, 63 P.3d 667.

¶ 45 Utah Code section 31A–22–305, as it existed on July 13, 1995, the day of Green's accident, is the applicable law.[7] That statute describes UIM insurance as additional or "secondary" insurance available when the liability or "primary" insurance recovery available to an accident victim is "insufficient ... to compensate fully the injured party for all special and general damages." Utah Code Ann. § 31A–22–305(8)(a) (1995). It provides that UIM coverage cannot be "set off against the [applicable] liability coverage," but is designed to be "added to, combined with, or stacked upon the [applicable] liability coverage." *Id.* § 31A–22–305(9)(b). Thus, there is no question that Green is entitled to stack

415, 454 P.2d 294 (1969), this court permitted insurers to enforce anti-stacking clauses in their policies in the context of uninsured motorist and underinsured motorist coverages. These cases are inapposite because they were decided before the legislature enacted a statute addressing the stacking issue.

7. The statutory scheme found in Utah Code Ann. section 31A–22–305 has been substantially overhauled since Green's accident. Accordingly, our interpretation of the statute as it existed in 1995 does not control stacking disputes arising under the statute as it exists today.

8. At the time of Green's accident, the particular statutory provisions addressing stacking in the context of UIM claims provided:

(10)(a) Underinsured motorist coverage under this section applies to bodily injury, sickness, disease, or death of an insured while occupying or using a motor vehicle owned by, furnished, or available for the regular use of the insured, a resident spouse, or resident relative of the insured, only if the motor vehicle is described in the policy under which a claim is made, or if the motor vehicle is a newly acquired or replacement vehicle covered under the terms of the policy. Except as provided in Subsection (10), a covered person injured in a vehicle described in a policy that includes underinsured motorist benefits may not elect to collect underinsured motorist coverage benefits from any other motor vehicle insurance policy under which he is a named insured.

(b)(i) The limit of liability for underinsured motorist coverage for two or more motor vehicles may not be added together, combined, or stacked to determine the limit of insurance coverage available to an injured person for any one accident.

any available UIM coverage on the $25,000 recovery she received from Murray's liability policy.

¶ 46 The UIM statute also addresses the circumstances under which an insured is entitled to stack UIM coverage.[8] The statute creates the general rule that a victim of an accident must recover any UIM coverage from the policy or policies covering the vehicle in which the victim was injured. A victim also is entitled to stack UIM coverage from other policies in certain situations specified in the statute. *Id.* § 31A–22–305(10)(c)(i). These include the situation where an insured is "injured while occupying or using a motor vehicle that is not owned by, furnished, or available for the regular use" of the insured, her spouse, or a resident relative. *Id.* § 31A–22–305(10)(c)(i)(B). In such a situa-

(ii) Subsection (b)(i) applies to all persons except a covered person as defined under subsection (c)(i)(B).

(iii) Coverage on a motor vehicle occupied at the time of an accident shall be primary coverage, and the coverage elected by a person described under Subsections (1)(a) and (b) shall be secondary coverage.

(c)(i) Each of the following persons may also recover underinsured motorist coverage benefits under any other policy in which they are described as a "covered person" as defined under Subsection (1):

(A) a covered person injured as a pedestrian by an underinsured motor vehicle; or

(B) a covered person injured while occupying or using a motor vehicle that is not owned by, furnished, or available for the regular use of the covered person, the covered person's resident spouse, or the covered person's resident relative.

(ii) This coverage shall only be available as a secondary source of coverage.

(iii) A covered person as defined under Subsection (c)(i)(B) is entitled to the highest limits of underinsured motorist coverage afforded for any one vehicle that the covered person is the named insured or an insured family member.

(iv) This coverage shall be in addition to the coverage on the vehicle the covered person is occupying.

(v) Neither the primary nor the secondary coverage may be set off against the other.

(d) A covered injured person is not barred against making subsequent elections if recovery is unavailable under previous elections.
Utah Code Ann. § 31A–22–305 (1995).

tion, the statute provides that the insured is "also" entitled to recover UIM benefits under "any other policy" in which she is described as a covered person.[9] *Id.* § 31A–22–305(10)(c)(i). The statute provides, however, that a covered person "is entitled to the highest limits of underinsured motorist coverage afforded for any one vehicle that the covered person is the named insured." *Id.* § 31A–22–305(10)(c)(iii).

¶ 47 We now apply the statutory language to the facts of this case. Because Green was injured while riding in her mother's car, which the parties agree was not "furnished, or available for" Green's regular use, subsection (10)(c)(i)(B) permits Green to stack her UIM coverage under "any other policy" in which she is described as a "covered person." *Id.* § 31A–22–305(10)(c)(i)(B). Green is defined as a "covered person" under both of her policies with State Farm.

¶ 48 Despite the language of subsection (10)(c)(i)(B), State Farm argues that Green is not entitled to stack her coverages. State Farm bases its argument on the seemingly contradictory provision of the statute, which limits a covered person's recovery "to the highest limits of underinsured motorist coverage afforded for any one vehicle" on which the covered person is a named insured. *Id.* § 31A–22–305(10)(c)(iii).

¶ 49 These confusing and arguably contradictory provisions are subject to two possible interpretations. One possible interpretation is that Green is barred from both interpolicy and intrapolicy stacking—i.e., that Green's right to recover under "any other policy" in subsection (10)(c)(i) is swallowed up by language restricting her coverage to the highest limit afforded for "any one vehicle" under subsection (10)(c)(iii). Under this interpretation, Green must choose one of her insured vehicles and may recover up to the limits applicable to that vehicle only, despite the fact that subsection (10)(c)(i) says she may also recover under "any other policy" in which she is a named insured.

¶ 50 The other possible interpretation of the two provisions is that the language limiting Green to the highest coverage for any one vehicle under subsection (10)(c)(i) is to be applied separately to each of the policies in which Green is listed as a named insured, rather than to all of Green's policies in the aggregate. Under this interpretation, Green would be entitled to recover up to the highest limit afforded for "any one vehicle" under each policy in which she is listed as a named insured. In short, under this interpretation, interpolicy stacking would be allowed, while intrapolicy stacking would be prohibited.

¶ 51 We hold that the proper interpretation of these ambiguous provisions is one that allows interpolicy stacking, thereby allowing Green to recover up to the limits of her UIM coverage for any one vehicle under both of her policies. We reach this conclusion for two reasons.

¶ 52 First, we are persuaded by the legislature's choice of language in subsection (10)(c)(i). Without limitation, that language states that, in addition to primary UIM coverage, an insured is *also* entitled to recover under "any other policy" in which the insured is listed as a covered person. Had the legislature intended to limit an insured's recovery to a single policy, regardless of how many policies were owned by the insured (that is, to prohibit interpolicy stacking), then subsection (10)(c)(i) would have contained language of limitation, i.e., language limiting additional recovery to "*one* other policy" or "any *one* other policy."[10]

---

9. The term "covered persons" includes:

    (a) the named insured;
    (b) persons related to the named insured by blood, marriage, adoption, or guardianship, who are residents of the named insured's household, including those who usually make their home in the same household but temporarily live elsewhere;
    (c) any person occupying or using a motor vehicle referred to in the policy or owned by a self-insurer; and

    (d) any person who is entitled to recover damages against the owner or operator of the uninsured or underinsured motor vehicle because of bodily injury to or death of persons under Subsection (1)(a), (b), or (c).
Utah Code Ann. § 31A–22–305(1) (1995).

10. Indeed, the current statutory provision found at Utah Code Ann. section 31A–22–305(10)(b)(i) provides that a person in Green's position "may also recover benefits under any *one* other policy." (Emphasis added.)

¶ 53 We also are persuaded by the fact that interpreting the statutory language to prohibit both interpolicy and intrapolicy stacking would create an unnecessary conflict between the two statutory provisions at issue. In fact, such an interpretation would render meaningless the portion of section 31A–22–305(10)(c)(i) allowing recovery under "any other policy." On the other hand, an interpretation allowing interpolicy stacking based on the provisions of subsection (10)(c)(i), but prohibiting intrapolicy stacking based on subsection (10)(c)(iii), harmonizes both provisions. We have long recognized that, if possible, statutes should be construed in such a way as to avoid statutory conflict and render all statutory provisions relevant and meaningful. *See State v. Hunt,* 906 P.2d 311, 312 (Utah 1995) ("[A]ny interpretation which renders parts or words in a statute inoperative or superfluous is to be avoided." (citations omitted)); *Millett v. Clark Clinic Corp.,* 609 P.2d 934, 936 (Utah 1980) ("[S]tatutory enactments are to be so construed as to render all parts thereof relevant and meaningful, and that interpretations are to be avoided which render some part of a provision nonsensical or absurd." (citations omitted)).

## CONCLUSION

¶ 54 The consent to settle exclusion in Green's State Farm policies is generally enforceable, but State Farm may not use a breach of that exclusion to deny UIM coverage unless it was actually prejudiced by the breach. The question of actual prejudice presents factual issues for which we remand to the district court. If, on remand, it is determined that State Farm was not actually prejudiced by Green's settlement with Murray, then we hold that Green is entitled to recover up to the highest limits of her UIM coverage for any one vehicle under both of her policies with State Farm. Accordingly, we vacate the summary judgment in favor of State Farm entered by the district court and remand for further proceedings consistent with this opinion.

¶ 55 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WIL-KINS, and Judge NEHRING concur in Justice PARRISH's opinion.

¶ 56 Justice RUSSON did not participate herein; District Judge RONALD E. NEHRING sat.