**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 3, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re:

RONALD LAVAR BAIRD and
JANEL JENSEN BAIRD,

       Debtors.

_____

ROBERT AND PAEA OLAH,
individually and on behalf of Olena
Olah, a minor,

       Plaintiffs-Appellants,

    v.

RONALD LAVAR BAIRD; J. KEVIN
BIRD in his capacity as Trustee of the
bankruptcy estate of Ronald Lavar
Baird; and UTAH MEDICAL
INSURANCE ASSOCIATION,

       Defendants-Appellees.

No. 07-4282

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:07-CV-382-BJS No. 06-22419)**

Joel T. Marker (Jamie L. Nopper, McKay, Burton & Thurman, Salt Lake City, Utah, and David R. Olson and Ruth Lybbert, Dewsnup, King & Olson, Salt Lake City, Utah, with him on the brief), McKay, Burton & Thurman, Salt Lake City, Utah, for Plaintiffs-Appellants.

Michael R. Johnson (David H. Leigh, Snell & Wilmer LLP, Salt Lake City, Utah, Shawn McGarry and Nan T. Bassett, Kipp & Christian, Salt Lake City, Utah, for appellee Ronald L. Baird; George A. Hunt, Williams & Hunt, Salt Lake City, Utah, for appellee Utah Medical Insurance Corporation, with him on the brief), Snell & Wilmer LLP, Salt Lake City, Utah, for Defendants-Appellees.

---

Before **McCONNELL**, **EBEL** and **GORSUCH**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Robert and Paea Olah sued Dr. Robert Baird for malpractice, based on alleged injuries to their daughter. While the state malpractice litigation was still in pretrial stages, Dr. Baird declared bankruptcy. The Olahs asked the trustee of Dr. Baird's bankruptcy estate to "sell" them Dr. Baird's right to consent to settlement under his medical liability insurance policy. The trustee balked, writing that by the terms of the insurance contract he did "not believe that there was any asset which the trustee could assume and assign to" the Olahs. The Olahs filed suit in district court, seeking a declaration that the "right to settle" was indeed part of the estate. They lost, and now appeal.

-2-

We reverse, holding that the liability policy is properly part of the estate. We further hold that the trustee has discretion to exercise Dr. Baird's rights under the policy, or to assign those rights to the Olahs.

## I. FACTUAL BACKGROUND

The legal issues in this case are complicated, but the facts are not. In March 2004, Robert and Paea Olah filed a complaint in Utah state court against Dr. Robert Baird, alleging that he was negligent in the delivery of their daughter, Olena, causing substantial injuries including permanent brain damage.[1] At the time the Olahs made their claim, Dr. Baird was insured under a liability policy ("Liability Policy") issued by the Utah Medical Insurance Association (UMIA), with a policy term of January 1, 2003 to January 1, 2004, and a policy limit of $1 million. The policy provided that UMIA would "defend [Dr. Baird] and provide insurance protection against medical professional liability claims for damages which are brought against" him. Under the policy, UMIA was obligated not to settle any claim against Dr. Baird without his consent; in addition, the policy restricted Dr. Baird's ability to assign the policy to a third party without the consent of the UMIA.

Two years later, in July 2006, Dr. Baird filed for bankruptcy, causing an automatic stay in the state court malpractice proceedings. He was discharged in

---

[1] The Olahs also asserted claims against other defendants involved in the delivery. Those claims have been settled.

bankruptcy in October of that year, and the automatic stay was lifted. Prior to the discharge, but after Dr. Baird filed for bankruptcy, the Olahs offered the trustee of Dr. Baird's bankruptcy estate $20,000 for the "estate's interest in the [Liability] Policy and all powers exercisable under the Policy by the debtor or the estate." The attorneys representing Dr. Baird sent the trustee a letter recommending he reject the offer, arguing, among other things, that Dr. Baird's right to consent to a settlement was non-assignable.

The trustee, Kevin Bird, rejected the offer. He wrote in a letter to the Olahs' attorney that it was his conclusion that "any contract rights" held by Dr. Baird under the insurance contract were "non-assignable." "As a result," Mr. Bird reasoned, he was unable to accept the offer. He suggested that if the Olahs disagreed with this conclusion they could file for a "determination as to the extent of the estate's interest in the contract." In the event that the Olahs were able to obtain a judgment declaring Dr. Baird's rights under the policy to be assignable, he would "certainly [be] willing to entertain [the Olahs'] offer again."

The Olahs filed suit in bankruptcy court, seeking a declaration that the liability policy was part of Dr. Baird's estate and "that the trustee may administer [it] pursuant to provisions of the Bankruptcy Code[.]" Dr. Baird moved to dismiss, making the non-assignability argument and adducing public policy considerations against allowing the assignment of rights to consent. UMIA in its brief contended that the policy could not be assigned without its written consent.

-4-

UMIA asserted, as well, that Dr. Baird's policy was "most probably" an "executory contract" and, because the trustee had not assumed the contract into the estate within 60 days of Dr. Baird's bankruptcy discharge, he—by statute—had rejected it.[2]

In their response, the Olahs first disagreed with UMIA that Dr. Baird's policy was an executory contract: they argued that an executory contract exists only when there are ongoing material obligations on both sides, and non-performance of one party would excuse the non-performance of the other. Dr. Baird, the Olahs claimed, had already fulfilled all of his obligations under the policy; accordingly, there was no time bar to assigning the asset. They further argued that the non-assignment provision of the policy was no longer enforceable because the loss—which they defined as the injury to their daughter—had already occurred, and under Utah law, "non-assignment provisions are enforceable only prior to the occurrence of loss." In addition, they asserted that public policy reasons did not forbid the assignment of Dr. Baird's policy rights to them.

---

[2]According to 11 U.S.C. § 365(d)(1),

In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

The bankruptcy court ruled against the Olahs. The court saw the case as turning on whether or not the policy was an "executory contract." If the contract was executory, then the trustee would have had sixty days to decide whether to accept or reject the contract. Because the trustee did not act, the contract must be deemed to have been rejected. In reaching this conclusion, the bankruptcy court first discussed a decision by the United States District Court for the District of Utah, which adopted the definition of an executory contract developed by Professor Vern Countryman in 1973. Vern Countryman, *Executory Contracts in Bankruptcy: Part 1*, 57 Minn. L. Rev. 439, 460 (1973). The so-called "Countryman" definition looks to whether

> the obligation of both the bankrupt and the other party are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.

Bkrptcy Op. 4 (quoting *Thomas American Stone & Bldg., Inc. v. White*, 142 B.R. 449, 452-53 (D. Utah 1992)). But the court also noted that a Tenth Circuit decision had held that an executory contract "is a contract that has not as yet been fully completed or performed and in which future obligations remain." Bkrptcy Op. 5 (citing *In re Myers*, 362 F.3d 667, 673 (10th Cir. 2004)). The court thought the Tenth Circuit definition might be "broader" than the Countryman test, because it seemed that the Tenth Circuit definition might find a contract executory if *any* obligations were remaining. Because the bankruptcy court found that not all of the obligations owing under the policy had been fully performed, the contract was

executory. Because the contract was executory, and the trustee of the estate did not timely assume the policy, the bankruptcy court ruled that it was not the property of the estate. Bkrptcy Op. 6.

The Olahs appealed to federal district court, urging that a contract is executory only when the obligations on both sides are "material" or "complex." They contended that Dr. Baird's obligations remaining on the policy were neither material nor complex; in the alternative, they asked for a remand to the bankruptcy court for a determination of whether the remaining obligations were either material or complex. In its brief, UMIA countered that the remaining obligations of both Dr. Baird and UMIA were "significant." Dr. Baird contended that under the Tenth Circuit's decision in *Myers*, "if there are future material obligations due by both sides under a contract, then the contract is an executory contract." He then proceeded to list the remaining obligations Dr. Baird and UMIA had under the insurance contract.

The district court affirmed the judgment of the bankruptcy court and adopted its reasoning. The Olahs now appeal to this court.

## II. DEFINING AN EXECUTORY CONTRACT

The appellants argue that this case hinges on the correct definition of 'executory contract' under 11 U.S.C. § 365(d)(1). Section 365(d)(1) specifies that if the trustee of an estate in bankruptcy does not assume an executory contract within sixty days of the order of relief, then that contract is deemed

rejected. Accordingly, if we determine that Dr. Baird's policy was an executory contract, then the contract was rejected. We agree that this is a key issue in the case.

The first step is to determine the proper definition of executory contract, something that was the subject of much back and forth in the prior proceedings. The bankruptcy court saw a tension between the two definitions offered in the cases it discussed. One—the Countryman definition—seems to count only the remaining *material* obligations of both parties in determining whether a contract is executory. *Thomas American Store & Building*, 142 B.R. at 452–53. The *Myers* definition, at least on the bankruptcy court's interpretation of it, holds that if there are *any* remaining obligations "on both sides" then the contract is executory. *In re Myers*, 362 F.3d at 673.

We do not agree with this interpretation of *Myers*. To be sure, *Myers* stated that "[a]n executory contract is 'a contract that has not as yet been fully completed or performed' and in which future obligations remain.'" *Myers*, 362 F.3d at 673 (quoting Black's Law Dictionary 395 (6th ed. 1991)). But the court in *Myers* went on to hold that the contract in question was executory because "material performance" remained on both sides. *Myers*, 362 F.3d at 673. Read in

-8-

context, the reference to "future obligations" was confined to future "material obligations."

If *Myers* stood for the proposition that any contract was executory that had "future obligations" left unfulfilled, however immaterial, then the "definition would render almost all agreements executory since it is the rare agreement that does not involve unperformed obligations on either side." *In re Streets & Beard Farm P'ship*, 882 F.2d 233, 235 (7th Cir. 1989). Rather, the remaining obligations have to be *significant*, which, following Countryman and *Thomas American Stone & Building*, we construe to be obligations which, if either side failed to perform them, would constitute a breach. We therefore take this occasion to formally adopt the Countryman definition, and construe *Myers* to be consistent with that definition. Other courts have construed § 365's use of executory contract similarly. *See Thomas Am. Stone*, 142 B.R. at 452 (noting that "courts have construed Congress' intent to be in accord with Professor Countryman's definition of executory contracts"); *In re Evatt*, 112 B.R. 417, 419 (W.D. Okla 1990) (collecting cases).

## III.  THE LIABILITY POLICY IS NOT AN EXECUTORY CONTRACT

Applying the Countryman definition of an executory contract, the Olahs contend that the liability policy between Dr. Baird and UMIA was not executory

at the time Dr. Baird declared bankruptcy because the relevant policy period, which was January 1, 2003 to January 1, 2004, had expired, and Dr. Baird had already paid for the policy for that period. No other obligations, they contend, are material. They rely on two cases which, they contend, hold that if the coverage period on the policy has expired, the policy cannot be executory even when there are ongoing obligations to the debtor. The two cases stand for roughly the same principle. The first, *Beloit Liquidating Trust v. United Ins. Co.*, 287 B.R. 904, 906 (N.D. Ill. 2002), stands for the proposition that "insurance policies where the policy coverage period has expired prior to the insured's bankruptcy are not executory contracts despite ongoing obligations of the debtor." The second, *In re Vanderveer Estates Holding, LLC*, 328 B.R. 18, 26 (Bankr. E.D.N.Y. 2005), states a similar principle: "insurance policies for which the policy periods have expired and the premium has been paid are not executory contracts, despite continuing obligations on the part of the insured."

UMIA and Dr. Baird, on the other hand, offer two reasons why the insurance contract between Dr. Baird and UMIA should be regarded as executory even under the Countryman definition. First, the policy was a continuing one, which would automatically be renewed unless either party to the contract affirmatively decided to discontinue it, which means that both parties had

-10-

material obligations stretching into the future. Specifically, they contend that "the language of the Liability Policy demonstrates that, although the policy has separate policy periods and requires new premiums to be paid each year in order to continue coverage, *the policy will automatically be renewed absent some affirmative act*" by either party. Appellees' Br. 11 (emphasis added). Second, even viewing the contract as a separate, one-year insurance contract, UMIA and Dr. Baird contend that both parties owed material duties under the contract. The bankruptcy court accepted the second argument.

We believe that Dr. Baird and UMIA's first argument conflates the terms "policy" and "policy period." The cases cited by the Olahs stand for the proposition that if a policy *period* has expired, then even though the debtor may have additional obligations, the contract for that period is not executory. The policy period during which the suit was filed, and for which Dr. Baird had paid the premium, had indisputably expired. The period was from January 1, 2003 to January 1, 2004. Even Dr. Baird's counsel stated below that he would "stipulate that we're dealing with a claims made liability policy *that deals with policy year 2003*. And I'll stipulate they [the Olahs] made their claim in 2003." (emphasis added). This is the contract for which Dr. Baird had paid the premiums. Although one provision of this contract involved renewal for future periods,

-11-

either party to the contract had the right to discontinue for those future periods, making it unrealistic to regard the contract as one extending indefinitely into the future.

The second argument offered by Dr. Baird and UMIA, and accepted by the bankruptcy court, is that Dr. Baird had continuing material obligations under the policy, which render the contract executory even under the Countryman definition. The most important such obligation is the obligation to provide cooperation in the course of defense to any liability claims. Appellee's Br. at 15.

We do not agree. Once the debtor has paid his premium for the policy period, he has then performed in such a way that he can no longer fall so far short of complete performance ("so far underperformed," to use the Countryman definition) that it would entitle UMIA to not defend him. The obligations that remain are best considered ministerial, and certainly not as "significant" as UMIA's continuing obligation to defend Dr. Baird. As the court stated in *In re Sudbury, Inc.*, 153 B.R. 776, 779 (N.D. Ohio 1993), an insurance company does not "bargain for the Debtor's cooperation in handling claims. It bargains for premiums." Even if the insured party were to fail to cooperate in breach of his contractual commitment, this would not excuse the insurer from performing entirely on the contract. *Id.* at 779 (insurer's obligations are not "voided because

-12-

of the Debtor's failure to cooperate" as cases "establish only that an Insurer may have a defense against a claim where the Debtor does not cooperate."); 44 Am. Jur. 2d Insurance § 786 (insured's failure to fulfil obligation to cooperate "may constitute a matter of defense").  Dr. Baird's failure to perform, in other words, would not allow UMIA to breach.

This conclusion comports with Utah law, which "prevents an insurance company from relying on certain technical policy breaches as a basis for denying coverage."  *State Farm Mut. Auto. Ins. Co. v. Green*, 89 P.3d 97, 104 (Utah 2003) (failure to provide notice or proof of loss cannot be the basis of denying coverage unless insurer was prejudiced by the failure).  There is nothing left, after Dr. Baird has paid his premium for the policy period, that would result in his so far underperforming that it would relieve UMIA from its obligations.  At most he could commit "technical policy breaches."  Accordingly, under the Countryman definition, there is no executory contract here.  It follows that the liability policy is an asset of the bankruptcy estate.

### V.  THE CONTRACT CAN BE ASSIGNED BY THE TRUSTEE

Dr. Baird's insurance policy contains two clauses that arguably might limit the ability of the trustee to assign the policy or to exercise Dr. Baird's right under the policy to veto a settlement: (1) a clause that "specifically restricts the

-13-

Debtor's ability to assign the policy to a third party without the consent of the UMIA" (the "non-assignability clause"), and (2) a clause that states UMIA was "obligated not to settle any claim against the Debtor without his consent" (the "settlement consent clause"). Bkrptcy Op. 2. Appellees argue that even if we find that the insurance contract is not executory we should "still affirm the Bankruptcy Court's dismissal . . . because the Liability Policy cannot be assigned to the Olahs (or anyone else for that matter)." Appellees' Br. 19. We hold that the non-assignability clause has no applicability under Utah law after the event triggering the loss has occurred, and that once the settlement consent right is assigned in bankruptcy to the trustee, there is no limitation on the trustee's further assignment of the right to another party.

The appellees do not appear to contend that the non-assignability clause of the policy prevents the liability policy from being assigned to the bankruptcy estate itself. Section 541(c)(1) of the Bankruptcy Code clearly speaks to this point: "an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law that restricts or conditions transfer of such interest by the debtor." 11 U.S.C. 541(c)(1)(A). So it is not the case that the policy cannot be assigned "to anyone" without UMIA's consent. The policy can be assigned to the

-14-

trustee, notwithstanding the restriction in the policy. The question then becomes whether the trustee may further assign the contract to the Olahs (or anyone else) without UMIA's consent, or whether either the trustee or an assignee may exercise Dr. Baird's right under the contract to approve or veto a settlement.

The question of the assignability of the liability policy is a question of state law. The parties agree that under Utah law, the assignability question depends on whether a *loss* has occurred in this case, because if a loss has occurred, then restrictions on assignability no longer have force. *Time Fin. Corp. v. Johnson Trucking Co.*, 458 P.2d 873, 875 (Utah 1969); 44 Am. Jur. 2d Insurance § 786 ("After a loss has been incurred, the claim to recover insurance proceeds may be effectively assigned by the insured."). The logic is that an insurance company is entitled to tailor its liability policy—to decide whether to issue the policy, what the premiums should be, and what terms to impose—to the risk it perceives to be taking with regard to the insured. It would be inconsistent with that calculus to allow the insured to transfer his policy to someone else, whose risk profile might be different. *See Northern Ins. Co. of New York v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1358 (9th Cir. 1992) ("Risk characteristics of the insured determine whether the insurer will provide coverage, and at what rate. An assignment could dramatically alter the insurer's exposure depending on the nature of the new

-15-

insured."). Once a loss has occurred and the insurance company is on the hook to defend against a tort action and to pay any judgment, this concern about assignment is obviated: the insured-against event has already happened, and what is being transferred is not the insurance company's ongoing responsibility for future risks, but the insurance company's liability for the consequences of a past event. *See Time Fin.*, 458 P.2d at 875 (distinguishing between a before-loss transfer of a "contractual relationship" and the after-loss transfer of a "money claim"). Thus, under the law of Utah and most other states, non-assignability provisions of liability insurance contracts may not be enforced after the event of a covered loss.

But what is a "loss"? The Olahs want to fix the loss at the time the accident occurred and the claim was subsequently filed: this, they say, is when the insurance company's duty to defend under the contract begins. The UMIA and Dr. Baird, by contrast, argue that no loss occurs under the contract until there has been a tort judgment or settlement; until that time, Dr. Baird has not been found liable for malpractice and may never be found liable.

The parties cite no relevant decisions from Utah or states with comparable policies regarding assignability during the period after the events giving rise to a liability claim have occurred (and the tort lawsuit filed) but before there has been

a judgment or settlement. We believe that the logic of the Utah legal principle against post-loss non-assignment supports the Olahs' view.

The rationale for Utah's legal principle is that prior to a loss, when no one knows whether a covered loss will occur, the risks of the policy depend heavily on the identity of the policyholder, but once the loss occurs, the degree of risk is essentially fixed; the only question is to whom any payments will be owed. The insurance company's need to bar assignment therefore ceases to be significant. This rationale points toward treating the event triggering coverage as being the loss, because that is the point when the degree of risk is fixed. Subsequent events may affect to whom payment must be made, but they cannot increase or decrease the risk to the company. Moreover, after suit has been filed, the insurance company has a duty to defend, which is an important feature of the insurance contract. Even if no liability is ultimately imposed, the costs of the legal defense are, in every realistic sense, a "loss." Finally, in a formal sense, it makes sense to distinguish between when the loss occurs and when liability is determined. Even though we do not know in this case *if* ultimate liability will ever be imposed, because we do not know whether Dr. Baird actually committed malpractice, we do know that *if* liability is imposed, the moment it fixed was the moment the accident occurred. *Ocean Accident & Guar. Corp. v. Sw Bell Tel. Co.*, 100 F.2d 441, 444

-17-

(8th Cir. 1939). The judgment against Dr. Baird (if there is one) would merely confirm that liability was fixed at that point. *See id*. at 447 (explaining that final judgment is simply confirmation of the moment at which liability attaches).

Against this interpretation, UMIA argues that allowing assignment to the Olahs would "*drastically* impact the risk and burden on UMIA." Appellee's Br. 27. Reluctant as we are to second-guess a party regarding its own interest, we are highly skeptical of this claim. Under the policy, UMIA has control over the conduct of the malpractice litigation against Dr. Baird. The company has the right to defend, and the right (subject to any veto rights Dr. Baird may have) to settle. No one can force the company to settle if the company does not think that is in its interest. If UMIA negotiates a mutually agreeable settlement of the malpractice case with the Olahs, it is in the interest of UMIA for the Olahs, not Dr. Baird, to exercise the right to accept or refuse the settlement. It is hard to see why an assignment of the settlement acceptance right to the Olahs would *increase* UMIA's risk or burden. Indeed, now that Dr. Baird has received his discharge in bankruptcy and will not be personally liable for any malpractice judgment, he has an inefficient and one-sided incentive to frustrate settlement and to insist that UMIA take the case to trial. Only his reputational interest is now on the line. He has nothing to lose and everything to gain from blocking settlement and forcing

-18-

UMIA to go to trial.  Thus, we do not accept UMIA's argument that it would impose unacceptable risk on the insurance company to allow assignment at this stage.  Quite the contrary.

That leaves Dr. Baird's argument that the settlement consent clause is personal to him and thus cannot be assigned.  Dr. Baird and UMIA mention this argument only briefly, Appellees' Br. 29, citing two "personal service" contract cases, neither of which dealt with insurance policies.  *In re Tonry*, 724 F.2d 467, 469 (5th Cir. 1984) (attorney's contingent fee contract); *In re Carrere*, 64 B.R. 156, 159 (Bankr. C.D. Cal. 1986) (contract to perform in the television series "General Hospital").  But in any event, it appears undisputed that this right under the contract, like all others, may be transferred to the bankruptcy trustee.  11 U.S.C. 541(c)(1). Once the right to approve or disapprove settlement leaves the hands of the insured, we see no reason why the trustee may not dispose of that right in whatever manner he regards as in the best interest of the estate. Presumably, the trustee could make an agreement with the Olahs to exercise this right in a particular way, and we see no reason why he should be barred from making an agreement with the Olahs to "sell" the right in exchange for value to the estate.  Or he could exercise the settlement approval right himself.  Even assuming the right is personal and non-transferrable in the first instance, once it

-19-

has been transferred to the bankruptcy trustee it has ceased to be personal and there is no reason in law or logic to forbid a further transfer.

## CONCLUSION

We therefore **REVERSE** the district court's decision that Dr. Baird's liability policy is not a part of the debtor's estate. We also hold that the right to consent to settlement under the policy can be assigned to the Olahs, at the discretion of the trustee. The next move belongs to the trustee, and to UMIA.